IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOOMERANG TUBE, LLC, a Delaware limited liability company, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-11247 (\_\_\_)<br><br>Joint Administration Requested |

**DECLARATION OF KEVIN NYSTROM, CHIEF RESTRUCTURING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER, AND PRESIDENT OF BOOMERANG TUBE, LLC, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

1. My name is Kevin Nystrom. I am the Chief Restructuring Officer, Interim Chief Executive Officer and President of Boomerang Tube, LLC ("**Boomerang**"). Boomerang is organized under the laws of the State of Delaware and is the direct parent of each of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"). Zolfo Cooper Management, LLC ("**Zolfo Cooper**"), of which I am a Managing Director, was engaged by Boomerang in January 2015 to assist the Debtors in managing their business and evaluating strategic alternatives. On February 19, 2015, I was appointed as Chief Restructuring Officer, Interim Chief Executive Officer, and President of Boomerang. In that capacity, I am familiar with the Debtors' day-to-day operations, business affairs and books and records.

2. Under its engagement with Boomerang, Zolfo Cooper has agreed to provide certain temporary personnel to assist the Debtors and to assist me in carrying out my role as an

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Boomerang Tube, LLC (9415); BTCSP, LLC (7632); and BT Financing, Inc. (6671). The location of the Debtors' corporate headquarters is 14567 North Outer Forty, Suite 500, Chesterfield, Missouri 63017.

01:16969881.15

officer of Boomerang. Zolfo Cooper specializes in providing restructuring advisory and crisis management services to financially distressed companies and their creditors. Zolfo Cooper is one of the world's leading financial advisory, interim management and litigation support firms, with a team of restructuring and litigation specialists. Zolfo Cooper specializes in advising debtors, creditors, investors and court-appointed officials in bankruptcy proceedings and out-of-court workouts. Zolfo Cooper has a reputation for quality and breadth of experience, and a proven track record for success, earned by serving clients in numerous nationally prominent bankruptcy proceedings.

3. This Declaration is submitted pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and I am authorized by Boomerang's Board of Directors to submit it on behalf of the Debtors. All facts set forth herein are based upon my personal knowledge of the Debtors' business and finances, information learned from my review of relevant documents, and/or information supplied to me by other members of the Debtors' management and the Debtors' advisors. If called upon to testify, I would testify to the facts set forth herein on that basis.

4. On the date hereof (the "**Petition Date**"), each of the Debtors commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). Each Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Declaration, the Debtors have requested that their chapter 11 cases be consolidated for procedural purposes.

5. In order to familiarize the Court with the Debtors, their chapter 11 petitions, the restructuring goals contemplated by the Debtors, and the relief requested in the First Day

Pleadings (as defined below), this Declaration (a) provides background information with respect to the Debtors' corporate history and their business operations, as well as a summary of the Debtors' prepetition capital structure, (b) describes the circumstances leading to the commencement of these chapter 11 cases, and (c) supports the Debtors' chapter 11 petitions and the relief requested in the First Day Pleadings.

A.      **The Debtors' Ownership and Corporate Structure**

6.      Boomerang, a Delaware limited liability company, was formed in 2007 as Oilfield Tubulars, LLC and changed its name to Boomerang Tube, LLC in 2008 when a majority interest in Boomerang was acquired by Access Tubulars, LLC and its affiliates ("**Tubulars**"). Boomerang has corporate offices in Chesterfield, Missouri and manufacturing facilities in Liberty, Texas. Tubulars owns approximately 81% of the equity interests in Boomerang. The Gregg Eisenberg Revocable Living Trust owns approximately 11% of the equity interests in Boomerang. There are a number of other equity holders, which each hold less than 3% of the equity interests in Boomerang. The list required under Bankruptcy Rule 1007 that identifies all of Boomerang's equity holders has been filed with Boomerang's chapter 11 petitions.

7.      BTCSP, LLC ("**BTCSP**"), a Delaware limited liability company, is a wholly-owned direct subsidiary of Boomerang, the sole purpose of which is to employ and act as the payroll entity for Boomerang's hourly employees.

8.      BT Financing, Inc. ("**BT Financing**"), a Delaware corporation, is also a wholly-owned direct subsidiary of Boomerang, which was created to serve as a funding vehicle for investors in Boomerang, but was never used for that purpose. BT Financing has no active purpose or current assets.

**B.     Overview of Debtors' Business**

9.      Boomerang is a leading manufacturer of welded Oil Country Tubular Goods ("**OCTG**") in the United States. OCTG are used by drillers in exploration and production of oil and natural gas and consist of drill pipe, casing and tubing. Boomerang achieved certification by the American Petroleum Institute ("**API**") in 2010 and rigorously maintains this certification—a testament to the quality of product that Boomerang provides to its customers. The Debtors' manufacturing facilities are in Liberty, Texas, strategically located near major steel production centers and end-user markets. With a 487,000 square foot plant that houses two mills and heat treat lines and a contingent 119 acres, these facilities constitute the second largest alloy OCTG mill in North America, with the capability to produce 360,000 tons annually of Electric Resistance Welded OCTG and annual "heat treat" capacity of 250,000 tons.

10.     All facets of the Debtors' operations are focused on quality, safety and customer satisfaction. The Debtors have in-house finishing capabilities and high-speed hydrostatic testers on site to ensure the quality of their OCTG products. In addition to the Debtors' in-house inspections by qualified personnel to verify compliance with API criteria, the Debtors host third-party inspectors located in dedicated areas within their facilities, who conduct inspections on all heat treated products using the latest in phased array ultrasound technology. Finally, the Debtors also have relationships with outside vendors that can inspect and finish the Debtors' products to ensure that all customer needs can be met.

11.     As of June 5, 2015, the Debtors employed 341 full-time and two part-time employees. There are 105 employees paid on a salaried basis, and the remaining employees are paid on an hourly basis. All of the Debtors' hourly employees, which are employed and paid by BTCSP, are based in their Liberty, Texas manufacturing facilities and are engaged in the

production and manufacture of the Debtors' OCTG products. The Debtors' salaried employees, which are employed and paid by Boomerang, comprise a mix of personnel based in their Liberty, Texas facilities and sales, corporate, or general and administrative personnel, who are mainly based at their headquarters outside of St. Louis, Missouri.

**C.     Prepetition Financial Overview**

12.     As of March 31, 2015, the Debtors reported total assets of approximately $299 million and total liabilities of approximately $461 million. As of the Petition Date, the Debtors had funded debt obligations of approximately $263.6 million, including indebtedness of approximately $33 million under the ABL Facility, $214 million under the Term Loan Facility, $6.6 million under the Bridge Loan Facility (each as defined below) and $10 million for capital financing leases. For the year ended December 31, 2014, the Debtors' operations generated gross sales of approximately $501 million and suffered net losses of approximately $17.8 million.

13.     *ABL Facility.* Boomerang is the borrower, and BT Financing and BTCSP are guarantors, under an amended and restated credit agreement, dated as of October 11, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "**ABL Loan Agreement**"), among Boomerang, the several financial institutions from time to time party thereto (the "**ABL Facility Lenders**") and Wells Fargo Capital Finance, LLC, as administrative agent for the ABL Facility Lenders (in such capacity, the "**ABL Facility Agent**" and together with the ABL Lenders, the "**ABL Secured Parties**"), which provides Boomerang with an asset-based revolving credit facility with aggregate commitments of up to $85 million, subject to a borrowing base limitation based on the Debtors' eligible accounts receivable and inventory (the "**ABL Facility**"). The ABL Facility matures on August 11, 2017.

14. The ABL Facility is secured on a first-priority basis by certain current assets of the Debtors, such as cash, accounts (other than the TL Deposit Account, as defined in the Bridge Loan Agreement defined below) and payment intangibles, inventory, and deposit accounts and all proceeds from such property and assets (the "**ABL Collateral**"). Certain advances under the ABL Facility not to exceed $2,774,000 (the "**Priority ABL Obligations**") are secured on a first-priority basis by the Term Collateral pursuant to the agreements entered into in connection with the Third Forbearance (as described more fully below).

15. *Term Loan Facility*. Boomerang is the borrower, and BT Financing and BTCSP are guarantors, under a credit agreement, dated as of October 11, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "**Term Loan Agreement**"), among Boomerang, the lenders from time to time party thereto (the "**Term Loan Lenders**") and Cortland Capital Market Services LLC, as administrative agent and collateral agent for the Term Loan Lenders (in such capacity, the "**Term Loan Agent**" and together with the Term Loan Lenders, the "**Term Secured Parties**"), which provided term loans in an aggregate principal amount of $230,000,000 (the "**Term Loan Facility**"). The Term Loan Facility matures on October 11, 2017.

16. The Term Loan Facility is secured on a third-priority basis by all of the assets of the Debtors that do not constitute ABL Collateral, including the TL Deposit Account, the capital stock of each of the present and future subsidiaries of Boomerang, all owned real property, equipment and fixtures, investment property, and intellectual property, and all proceeds from such property and assets (the "**Term Collateral**"). The liens held by the Term Agent are subordinate to those liens held to secure the Debtors' obligations under the Bridge Loan Agreement (as defined below) and the Priority ABL Obligations.

17. Principal amortization is payable in consecutive quarterly installments, in the amount of 1.25% of the aggregate par principal amount of the loans outstanding on the Term Loan Facility closing date, until maturity. Boomerang is obligated to make mandatory prepayments upon the occurrence of certain events, including additional debt issuances, certain asset sales, and excess cash flow generation.

18. *Bridge Loan Facility.*  As described below, to address the Debtors' liquidity needs while restructuring discussions continued, on April 6, 2015, Boomerang and certain Term Loan Lenders entered into that certain credit agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Bridge Loan Agreement**"), among Boomerang, the lenders from time to time party thereto (the "**Bridge Loan Lenders**") and Cortland Capital Market Services LLC, as administrative agent and collateral agent for the Bridge Loan Lenders (in such capacity, the "**Bridge Loan Agent**" and together with the Bridge Lenders, the "**Bridge Secured Parties**" and collectively with the ABL Secured Parties and the Term Secured Parties, the "**Pre-Petition Secured Parties**"), which provided term loans in an aggregate principal amount of up to $6.2 million (the "**Bridge Loan Facility**").  Boomerang is the borrower, and BT Financing and BTCSP are guarantors, under the Bridge Loan Facility.

19. The Bridge Loan Facility matured on June 5, 2015 and is secured on a first-priority basis by the Term Collateral, subject only to the liens securing the Priority ABL Obligations.

20. *Intercreditor Agreement.* The relative rights of the ABL Facility Lenders, the Term Loan Lenders, and the Bridge Loan Lenders with respect to the ABL Collateral and Term Collateral are governed by that certain amended and restated intercreditor agreement, dated as of April 6, 2015 (the "**Intercreditor Agreement**"), by and among the Debtors, the ABL Facility

Agent, the Term Loan Agent and the Bridge Loan Agent.

21. The Debtors also incur permitted and subordinate secured indebtedness in the ordinary course of their business, including but not limited to, to finance capital equipment, finance insurance premiums, and maintain customer prepayments.

22. The Debtors' outstanding principal unsecured indebtedness consists of trade payables and fixed charges owed to lessors and other vendors of approximately $37.3 million as of June 5, 2015. The Debtors also have regular and recurring compensation and benefit obligations to their employees, which are current and are paid in the ordinary course of business.

**D.    Events Leading to Debtors' Chapter 11 Filings**

i.    *Impact of Oil and Gas Industry Conditions.*

23. The Debtors' products are designed specifically for use in the oil and gas industry. Therefore, the economic downturn in that industry has had a direct and immediate impact on the Debtors' sales and overall business condition. The industry has been hit hard by a swift and drastic drop in crude oil prices primarily as a result of an oversupplied global market and the strengthening of the U.S. dollar. West Texas Intermediate ("**WTI**") crude oil prices moved from $107 per barrel in June 2014 to a low of $44 per barrel in January 2015, a decline of approximately 60%, leading to daily losses of $1.5 billion for members of the Organization of Petroleum Exporting Countries ("**OPEC**").

24. Given the surplus of crude oil, drilling rig counts in the United States fell from 1929 in September 2014 to 875 at May 29, 2015. United States exploration and production companies drastically reduced capital expenditure budgets in 2015, with many companies reducing their expected spending by over 40%. As exploration and production companies' capital budgets have been reduced, distributors have been forced to reduce their inventory levels.

Accordingly, the Debtors' revenues went down by 62% in the first quarter of 2015 as compared to the fourth quarter of 2014. Although WTI crude oil prices recently rallied to over $60 per barrel in May, and domestic commercial crude oil inventories have declined over the past several weeks, drilling rig activity continues to decline as producers await stability in oil prices before committing to incremental drilling activity.

25. In 2014, the Debtors began exploring cost-reducing initiatives and other initiatives that generated over $10.7 million in EBITDA improvements. In January 2015, the Debtors engaged Zolfo Cooper to assist in managing the Debtors and evaluating potential strategic alternatives.

26. Despite current oil industry economics, the Debtors continued to meet their revenue projections for February through May of this year and anticipate that the industry will begin to recover in the second half of this year. The precise timing of recovery, however, will be driven by oil prices, related drilling activity, and the supply and demand dynamics of the domestic OCTG industry.

ii. *Events of Defaults and Related Lender Negotiations*

27. In January and February of this year, the Debtors initiated a dialog with the ABL Facility Lenders and the Term Loan Lenders to address the Debtors' tightening liquidity resulting from challenging market conditions and to request incremental liquidity and other related relief. On February 25, 2015, the ABL Facility Agent obtained an updated inventory valuation, which significantly reduced the existing valuation of the Debtors' inventory and resulted in a substantial decline in the borrowing base under the ABL Facility. As a result, the Debtors' outstanding balance under the ABL Facility exceeded the borrowing base. On March 4, 2015, the ABL Facility Agent delivered a notice of an event of default related to such

overadvance and financial covenants under the ABL Loan Agreement.

28.     The Debtors immediately engaged in discussions with the ABL Facility Agent regarding not only the valuation of the inventory, but also the Debtors' precarious liquidity position.  The Debtors requested that the ABL Facility Agent advance additional funds to pay payroll and other operation-critical needs.  The Debtors, the ABL Facility Agent and the ABL Facility Lenders entered into a Forbearance Agreement dated March 17, 2015 (the "**Initial Forbearance**"), pursuant to which the ABL Facility Lenders agreed to make up to $2,045,263 of additional advances and forbear from exercising their rights under the ABL Loan Agreement until March 23, 2015.

29.     Prior to and contemporaneously with the discussions with the ABL Facility Agent, the Debtors sought additional funding sources from the Term Loan Lenders and Tubulars as well as other parties.  As a result of these discussions, and while the Initial Forbearance was in place, the Debtors' primary stakeholders negotiated a draft form of Restructuring Plan Support Agreement (the "**March RSA**") for restructuring the Term Loan Facility obligations and recapitalizing the Debtors out of court, which contemplated a substantial new investment by Tubulars and a significant reduction of the Term Loan Facility obligations.

30.     While the March RSA was still being negotiated, the Debtors, the ABL Facility Agent and the ABL Facility Lenders negotiated and entered into a Forbearance Agreement dated March 25, 2015 (the "**Second Forbearance**"), pursuant to which the ABL Facility Lenders agreed to make certain additional advances and forbear from exercising their rights under the ABL Loan Agreement until March 30, 2015.  As a condition to the Second Forbearance, the ABL Facility Lenders required, and Tubulars provided, a limited guaranty in favor of the ABL Facility Agent and the ABL Facility Lenders of $500,000 for certain additional advances under

the Second Forbearance.

31. The March RSA, which required, among other things, the unanimous consent of the Term Loan Lenders to be implemented out of court, ultimately received the support of the Debtors, Tubulars, the ABL Facility Lenders and all but one of the Term Loan Lenders. To allow the Debtors to continue exploring their restructuring options, the Debtors and the ABL Facility Lenders negotiated and entered into a Forbearance Agreement dated March 31, 2015 (the "**Third Forbearance**"), pursuant to which the ABL Facility Lenders agreed to make certain additional advances and forbear from exercising their rights under the ABL Loan Agreement until April 6, 2015. As a condition to the Third Forbearance, the ABL Facility Lenders required, and the Debtors provided with the consent of the Term Loan Agent, a senior security interest in the Term Collateral to secure the Priority ABL Obligations in an amount not to exceed $2,774,000.

32. In light of the failure to obtain the unanimous support of the Term Loan Lenders to implement the March RSA, the Debtors' primary stakeholders focused their attention to in-court restructuring alternatives. During this period, Tubulars renewed its offer to make a substantial investment in the business as part of an out-of-court restructuring, which was ultimately not successful.

33. To provide sufficient time and liquidity necessary to operate the Debtors' business and to continue to pursue various strategic restructuring alternatives, including the possibility of a consensual chapter 11 plan, on April 6, 2015, the Debtors, the ABL Facility Lenders and certain of the Term Loan Lenders negotiated and entered into the following material agreements:

    a) the Forbearance Agreement dated April 6, 2015 (the "**Fourth Forbearance**"), pursuant to which the ABL Facility Lenders agreed to make certain

additional advances and forbear from exercising their rights under the ABL Loan Agreement until May 11, 2015;

b) the Forbearance Agreement and Amendment No. 2 to the Term Loan Agreement dated April 6, 2015 (the "**Term Loan Forbearance**"), pursuant to which the Term Loan Lenders agreed to permit the granting of liens securing the Bridge Loan Facility and forbear from exercising their rights under the Term Loan Agreement until May 11, 2015; and

c) the Bridge Loan Agreement, pursuant to which, as described more fully above, certain Term Loan Lenders agreed to provide additional liquidity of up to $6.2 million.

34. Since April 6, 2015, the Debtors, certain Term Loan Lenders, certain Bridge Loan Lenders, the ABL Facility Lenders and Tubulars have vigorously negotiated terms of a chapter 11 plan that may be supported by all major parties in interest and arranged debtor in possession and exit financing.

35. Given the great strides taken by the Debtors, the Term Loan Lenders and the ABL Facility Lenders agreed to continue forbearing from exercising their rights until June 5, 2015. Additionally, the Bridge Loan Lenders agreed to extend the original maturity date under the Bridge Loan Facility from May 31, 2015 to June 5, 2015.

36. On June 9, 2015, the Debtors, the Term Loan Lenders, certain Bridge Loan Lenders, the ABL Facility Lenders and Tubulars entered into a Plan Support Agreement (the "**Plan Support Agreement**"). Pursuant to the terms of the Plan Support Agreement, the parties thereto have agreed to support a restructuring transaction that will materially delever the Debtors' balance sheet and provide significant liquidity to the business.

37. More specifically, the restructuring proposed under the Plan Support Agreement reduces the Debtors' funded debt obligations by converting approximately $214 million in outstanding principal of Term Loan Facility obligations into (i) 100% of the New Holdco Common Stock (subject to dilution for (1) the payment of Backstop Exit Fee and Exit Closing

Fee equal to 20% of equity of New Holdco in the aggregate and (2) issuances of equity under a management incentive plan not to exceed 5% of the total outstanding equity of New Holdco) and (ii) $55 million of subordinated notes issued by the Reorganized Borrower, a wholly-owned direct subsidiary of New Holdco, and secured by a third-priority lien on the ABL Collateral and Term Collateral.

### E.     Support of First Day Pleadings

38.     To minimize the adverse effects of the commencement of these chapter 11 cases, and to provide the Debtors' business with the much needed liquidity they lacked in the months leading up to the Petition Date, the Debtors have requested a variety of relief in "first day" motions and applications (each, a "**First Day Pleading**" and, collectively, the "**First Day Pleadings**"), filed concurrently herewith.  A list of the First Day Pleadings is attached hereto as **Exhibit A**.  I am familiar with the contents of each of the First Day Pleadings, and to the best of my knowledge, information and belief, the facts set forth therein are true and correct.  I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.

39.     In sum, the First Day Pleadings seek to implement a trio of goals that are intended to promptly restore the Debtors' operations to the ordinary course of business so that the Debtors' business can emerge from chapter 11 poised for success and a return to profitability.  One purpose is to allow the Debtors to promptly begin normalizing and stabilizing their vendor relationships to secure the flow of goods and services required to continue the Debtors' OCTG manufacturing processes and meet their customers' needs, including paying prepetition claims that the Debtors deem essential to preserving and maximizing the value of their assets and operations as a going concern.  A second purpose is to provide the Debtors' employees certainty that the Debtors can—and will—meet the obligations under the Debtors' various employee

compensation and benefit programs.  This is essential given that the Debtors are asking the employees, and indeed relying on them, to continue to support the business during and following these chapter 11 cases.  A third purpose is to assure the Debtors' customers that the Debtors will continue to operate over the long-term, stand by their customer commitments, and ensure the Debtors' position as a go-to business partner for years to come.  I believe that the relief included in the First Day Pleadings is necessary to accomplish these goals.

40. The Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to obtain financing and make certain critical payments and otherwise continue operating in the ordinary course of business as sought in the First Day Pleadings.  In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' operations, thereby preserving and maximizing the value of the Debtors' estates for the benefits of their creditors, employees and customers.

*[remainder of page intentionally left blank]*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 9, 2015

                                          */s/ Kevin Nystrom*
                                          Kevin Nystrom
                                          President, Interim Chief Executive Officer and
                                          Chief Restructuring Officer
                                          Boomerang Tube, LLC

*[Signature Page to First Day Declaration]*

## Exhibit A

## List of First Day Pleadings

1. Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases

2. Debtors' Application for Entry of an Order, Pursuant to 28 U.S.C. § 156(c), (A) Approving the Retention and Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtors, Effective Nunc Pro Tunc to the Petition Date and (B) Granting Related Relief

3. Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, Including Bank Accounts, and Honor Related Prepetition Fees and Expenses, and (II) Maintain Their Existing Business Forms, (B) Authorizing Continued Intercompany Transfers Related to Payroll Funding, and (C) Granting a Waiver of the Investment and Deposit Requirements of Section 345(b) of the Bankruptcy Code

4. Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Honor and Pay Prepetition Customer Obligations and (B) Granting Relief From the Automatic Stay to Continue Certain Customer Programs, and (C) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations

5. Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Pay and Honor Certain Prepetition Wages, Benefits and Other Compensation Obligations and (B) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations

6. Debtors' Motion for Entry of Interim and Final Orders (A) Prohibiting Utilities From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance and (C) Establishing Procedures for Determining Adequate Assurance of Payment

7. Debtors' Motion for Entry of Order (A) Authorizing Debtors to (I) Continue Insurance Programs, (II) Pay All Obligations In Respect Thereof, and (III) Continue to Honor Insurance Premium Financing Obligations, and (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations

8. Debtors' Motion for Entry of an Order (A) Authorizing Payment of Certain Prepetition Taxes and Fees and (B) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers

9. Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Shippers and Warehousemen and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests

10. Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Postpetition Financing Under Two Credit Facilities, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief