## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOOMERANG TUBE, LLC, a Delaware<br>limited liability company, et al.,<br><br>             Debtors. | Chapter 11<br><br>Case No. 15-11247<br><br>(Jointly Administered)<br><br>**Obj. Deadline: September 14, 2015 at 4:00 p.m.**<br>**Hearing Date: September 21, 2015 at 10:30 a.m.**<br><br>**Related Docket No.: 470** |

### OBJECTION OF SB BOOMERANG TUBULAR, LLC TO DEBTORS'
### AMENDED JOINT PREARRANGED CHAPTER 11 PLAN

SB Boomerang Tubular, LLC ("**SBBT**") by and through its undersigned counsel, hereby submits this objection (the "**Objection**") to the Debtors' *Amended Joint Prearranged Chapter 11 Plan* (the "**Plan**") [Docket No. 470]. In support hereof, SBBT respectfully states as follows:

### FACTUAL AND PROCEDURAL BACKGROUND

1.     On June 9, 2015 (the "**Petition Date**"), Boomerang Tube, LLC ("**Boomerang**" or the "**Debtor**") filed for Chapter 11 protection under the United States Bankruptcy Code (the "**Bankruptcy Code**"), initiating the above-captioned case.

2.     SBBT is the lessor to Debtor/Lessee Boomerang Tube, LLC, of certain equipment known as heat treatment, quench and temper equipment that was manufactured by F&D Furnaces, LLC (the "**Equipment**"). The Equipment is located at 11000 FM 3661 in Liberty, Texas, at the Debtors' facility. SBBT is the owner of the Equipment, and has operated as lessor under the lease of this equipment since 2011. Boomerang is obligated to SBBT under the terms

of that certain Equipment Lease Agreement between Boomerang and SBBT dated February 18, 2011 (as amended on June 10, 2014).[1]

3.      As discussed below, the Lease should be treated as a "true lease" in these chapter 11 cases. However, if the Lease were to be recharacterized as a secured financing by the Court, SBBT enjoys a properly perfected first priority secured claim in the amount of $12,590,518.64 against Boomerang, secured by the Equipment that is the subject of the Lease (the "**SBI Secured Claim**"). Debtors have not challenged the validity of SBBT's security interest.

4.      On September 3, 2015 the Debtors filed an amended joint prearranged plan of reorganization, under which the Debtors propose to recharacterize the Lease as a secured financing transaction and either: (i) (had SBBT not taken a § 1111(b) election) pay SBBT's secured claim with an "SBI Secured Note" in an amount no greater than $4.5 million bearing interest at 4.0% per annum and payable over 84 monthly installments; or (ii) (if, as is now the case, SBBT takes the § 1111(b) election) pay SBBT on the SBI Secured Note and pay SBI the remainder of its claim with an "SBI Nonrecourse Note" payable in full at no interest 12 years after the effective date of the Plan, provided that the Bankruptcy Court finds that the liens securing SBBT's claim are not of inconsequential value. The Debtors propose that SBBT's claim

---

[1] Wells Fargo Equipment Finance, Inc. ("**Wells Fargo Equipment**") partially financed SBBT's purchase of the Heat Treat Line Collateral, which SBBT leased to Boomerang. Although Wells Fargo Equipment has a security interest in the Equipment, that interest is a result of the financing arrangement between SBBT and Wells Fargo Equipment. Boomerang has no direct agreements with Wells Fargo Equipment. Well Fargo Equipment has not even filed a proof of claim in Boomerang's bankruptcy case. On August 10, Boomerang filed amended schedules listing Well Fargo Equipment as the holder of a contingent, unliquidated and disputed secured claim, but did not list any collateral or a claim amount. *See* Boomerang's Amended Schedule D filed August 10, 2015. The recently-filed amended plan provides SBBT with the "*SBI Secured Note*" and, in the case of SBB Tubular making a § 1111(b) election, the "*SBI Nonrecourse Note*" which note amounts shall be "less the amount of the Allowed SBI Lender Secured Claim." *See* Plan, 1.1.145, 1.1.147, and 3.2(e). The Plan defines the "*SBI Lender*" to mean Wells Fargo Equipment Finance, Inc. and the "*SBI Lender Secured Claim* as "the Claim against SBI arising under the SBI Lender Financing Agreement, to the extent such Claim is secured by a Lien in the SBI Heat Treat Line Collateral … ." Plan, 1.1.142 and 144. The "*SBI Lender Financing Agreement*" is defined as an agreement dated September 12, 2011, by and between SBI and the SBI Lender. *Id.* at 1.1.143.

be subject to and subordinate to any allowed secured claim of SBI Lender Wells Fargo Equipment.

5.      For the reasons stated below, SBBT objects to the Plan's proposed: (i) recharacterization of the Lease as a secured financing; (ii) 4.0% interest rate on the SBI Secured Note; (iii) $4.5 million valuation of SBI's collateral; (iv) terms of payment if, as is now the case, SBI takes the § 1111(b) election; and (v) and subordination of SBI's claim to the SBI Lender Claim. The Debtors' proposed Plan does not comply with Bankruptcy Code requirements under §§ 1111(b), 1129(a)(1), 1129(a)(7)(B), 1129(a)(11), 1129(b)(1), and 1129(b)(2). The proposed Plan is not feasible; nor is it fair and equitable, so it should not be confirmed.

## OBJECTION

## I.    *The Debtors' Proposed Recharacterization of the Lease Is Not Supported by the Agreement's Terms, Applicable Law or the Economic Realities of the Transaction and Should Be Rejected.*

6.      Debtors seek by their proposed Plan to impermissibly recharacterize the Lease as a financing agreement. But the terms of the Lease, applicable law, and the economic realities of the transaction between SBBT and Boomerang belie Debtors' proposed treatment. The Lease is a true lease under the law, and the Court should reject the Debtors' proposed recharacterization.

### A.    The Debtors Bear the Burden to Prove that the Lease is Anything Other Than a Lease.

7.      The Debtors, as the party seeking to recharacterize the Lease, bear the burden of proving it is anything other than a lease. *In re Pillowtex, Inc.,* 349 B.R. 711, 716 (3d Cir. 2003); *In re Triplex Marine Maintenance, Inc.,* 258 B.R. 659, 664 n.8 (Bankr. E.D. Tex. 2000).

### B.    The Texas UCC Governs the Court's Examination of the Lease.

8.      Whether an agreement is a true lease or a secured financing arrangement under the Bankruptcy Code is a question of state law. *Pillowtex, Inc.,* 349 B.R. at 716 (*citing In re*

*Continental Airlines, Inc.,* 932 F.2d 282 (3d Cir. 1991)); *In re Montgomery Ward, LLC,* 469 B.R. 522, 528 (Bankr. D. Del. 2012); *In re Homeplace Stores, Inc.,* 228 B.R. 88, 92 (Bankr. D. Del. 1998).

9.      The Equipment that is the subject of the Lease is located in Texas, and the Lease provides that it is governed by and must be interpreted under Texas law. Lease at § 31. Texas has adopted the Uniform Commercial Code. *See Tex. bus. & Com. Code Ann. § 1.101 et seq.* (hereinafter, the "**Texas UCC**"). Section 1.201 of the Texas UCC defines the term "security interest," and provides that "[w]hether a transaction in the form of a lease creates a security interest is determined pursuant to Section 1.203." *See Texas UCC* § 1.201(b)(35).

10.     Section 1.203(a) of the Texas UCC provides that whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case. *Texas UCC* § 1.203(a). Section 1.203(b) of the Texas UCC then sets forth a two-part test, sometimes referred to as the bright-line test or *per se* rule, for determining whether a transaction creates a security interest as a matter of law. Section 1.203(b) provides:

> (b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>
> (1)  the original term of the lease is equal to or greater than the remaining economic life of the goods;
>
> (2)  the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>
> (3)  the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement;  or

(4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

*Texas UCC* § 1.203(b).[2] The four enumerated factors above relate to whether residual value will remain for the lessor at the end of the term of the lease. *Pillowtex,* 349 F.3d at 718.

11.    Under this two-part test, the Lease can only be found to be a security agreement as a matter of law if Boomerang did not have the right to terminate its payment obligations under the Lease prior to the end of its term <u>and</u> one of the other four factors set forth in section 1.203(b) is present. *See, e.g., HP Distribution,* 436 B.R. at 685 (applying section 1.203 of the Texas UCC); *In re Newsome,* 2003 Bankr. LEXIS 514 at *12-13 (Bankr. N.D. Tex. May 8, 2003) (applying former section 1.201(37) of the Texas UCC); *see also Pillowtex*, 349 F.3d at 717 (applying former section 1.201(37) under the New York UCC).

### C.    The Lease is Not a *Per Se* Security Agreement under the Bright Line Test of Texas UCC 1.203(b)(2).

12.    With respect to the first step in the two-step bright-line analysis, Boomerang was not entitled to terminate its payment obligations prior to the end of the Lease term. The Lease is not a *per se* security agreement, however, because none of the other four factors under the bright-line test are present.

### i.    Boomerang is Not Bound to Renew the Lease or Purchase the Equipment.

13.    First, under the terms of the Lease, Boomerang is not "bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods."

---

[2] Section 1.203 of the Texas UCC became effective September 1, 2003 with an extensive amendment of Chapter 1. *In re HP Distribution, LLP,* 436 B.R. 679, 684 n.22 (Bankr. D. Kan. Sept. 3, 2010). Due to deletion and renumbering of the definitions, the definition of security interest in former section 1.201(37) is now encompassed at 1.201(35), and the test for distinguishing a true lease from a disguised security agreement that was set forth in former section 1.201(37) is now set forth in section 1.203. Thus, decisions applying the former section 1.201(37) of the UCC are relevant to the analysis of the Lease under Texas law.

*Texas UCC* § 1.203(b)(2). Section 7(d) of the Lease sets forth the renewal and purchase options at the end of the Lease's term:

> (d)    *Options Following Lease Term.* At the end of the Lease Term, the parties **may (a) renew this Lease** or (b) enter into a new lease, in either case on terms mutually agreeable to both parties. If the parties fail to either renew this Lease or enter into a new lease, then (a) **Lessor may require Lessee to purchase the Equipment** for a purchase price equal to 50% of Total Cost (the "**Sale Option**") or (b) Lessee may require the Lessor to sell the Equipment for a purchase price equal to 50% of Total Cost (the "**Final Purchase Option**" and, together with the First Purchase Option, the Second Purchase Option and the Third Purchase Option, the "**Purchase Options**"). Lessor may exercise the Sale Option or Lessee may exercise the Final Purchase Option by providing written notice to the other party no later than 180 days prior to the last day of the original Lease term.

Lease at § 7(d) (emphasis added).

14.     The Lease therefore provides that the parties *may* renew the Lease on mutually agreeable terms, or that SBBT *may* exercise the Sale Option, requiring Boomerang to purchase the Equipment for 50% of the Total Cost. Boomerang was not unconditionally obligated to renew the Lease or acquire the Equipment; accordingly this factor under Section 1.203(b)(2) is not satisfied.

### ii.     Boomerang Cannot Renew the Lease for No or Nominal Additional Consideration.

15.     Second, Section 7(d) of the Lease makes clear that Boomerang does not have "an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement." Texas UCC § 1.203(b)(3). On the contrary, the renewal provisions under Section 7(d) require that renewal be "on terms mutually agreeable to both parties." Nothing in the Lease supports an argument that Boomerang is entitled to renew it for no or nominal additional consideration.

### iii.    Boomerang Cannot Purchase the Equipment for No or Nominal Additional Consideration.

16.    Third, Boomerang does not have an option "to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement." Texas UCC § 1.203(b)(4).

17.    Section 7 of the Agreement sets forth Boomerang's various options to purchase the Equipment. The first three of these options are triggered within three years of the "Lease Commencement Date" and set the purchase price to be the remaining outstanding principal under the Lease plus a percentage of the "Total Cost" of the Equipment:

(a)    *First Purchase Option.* For a period of six months beginning on August 7, 2012, Lessee shall have the option (the "**First Purchase Option**") to purchase the Equipment from Lessor for a purchase price equal to (i) all outstanding principal under the Lease payment schedule attached hereto as Appendix A (the "**Lease Payment Schedule**") and accrued and unpaid interest, if any, up to the purchase date, plus (ii) an amount equal to 35% of Total Cost. Lessee may exercise the First Purchase Option by giving written notice to Lessor at any time within the sixth [sic] month period.

(b)    *Second Purchase Option.* For a period of 45 days immediately following the second anniversary of the Lease Commencement Date, Lessee shall have the option (the "**Second Purchase Option**") to purchase the Equipment from Lessor for a purchase price equal to (i) all outstanding principal under the Lease Payment Schedule and accrued and unpaid interest, if any, up to the purchase date, plus (ii) an amount equal to 35% of Total Cost. Lessee may exercise the Second Purchase Option by giving written notice to Lessor at any time within the 45 day period immediately following the end of the second year of the Lease Term.

(c)    *Third Purchase Option.* For a period of 45 days immediately following the third anniversary of the Lease Commencement Date, Lessee shall have the option (the "**Third Purchase Option**") to purchase the Equipment from Lessor for a purchase price equal to (i) all outstanding principal under the Lease Payment Schedule and accrued and unpaid interest, if any, up to the purchase date, plus (ii) an amount equal to 40% of Total Cost. Lessee may exercise the Third Purchase Option by giving written notice to Lessor at

any time within the 45 day period immediately following the end
of the fourth year of the Lease Term.

"Total Cost" is defined under the Lease to mean "the sum of Equipment Cost and Accrued

Interest." Lease at § 4(f). "Equipment Cost" in turn is defined to mean "the total cost Lessor will

pay Manufacturer for the Equipment, which amount is expected to be approximately

$13,000,000." Lease at § 4(b).

18.     If Boomerang does not exercise any of these three purchase options, it is still

entitled to purchase the Equipment at the conclusion of the Lease's term pursuant to Section

7(d), which, as noted above, provides that if the parties fail to either renew the Lease or enter

into a new lease, then "(a) Lessor may require Lessee to purchase the Equipment for a purchase

price equal to 50% of Total Cost (the "**Sale Option**") or (b) Lessee may require the Lessor to sell

the Equipment for a purchase price equal to 50% of Total Cost (the "**Final Purchase Option**"

and, together with the First Purchase Option, the Second Purchase Option and the Third Purchase

Option, the "**Purchase Options**")." Lease at § 7(d). Under this section, at the end of the Lease

term, the purchase price for the Equipment would be 50% of the Total Cost, *i.e.,* approximately

$7,000,000 (based on a Total Cost of $14,217,486, as reflected in the Lease Payment Schedule

attached to the Lease).

19.     The Debtors cannot reasonably argue that Boomerang's Purchase Options, which

range from approximately $4.9 million (35% of Total Cost) to over $7 million (50% of Total

Cost) were for no consideration. Nor can the Purchase Options be found to be for nominal

consideration.

20.     Section 1.203(d) of the Texas UCC gives guidance as to what constitutes nominal

consideration. It provides that additional consideration is nominal "if it is less than the lessee's

reasonably predictable cost of performing under the lease agreement if the option is not

exercised." Texas UCC § 1.203(d). None of Boomerang's purchase options under the Lease satisfy this test. Each of the First, Second, and Third Purchase Options set the purchase price to be the remaining outstanding Principal under the Lease Payment Schedule, plus a percentage of the Total Cost of the Equipment. Therefore, each purchase option that could be exercised during the life of the Lease required Boomerang to pay materially more, not less, than its cost to simply perform its obligations for the life of the Lease. Furthermore, Boomerang's Final Purchase Option, which sets the purchase price at 50% of the Total Cost of the Equipment, can only be exercised at the conclusion of the Lease term, when Boomerang would have no further lease payments to make. Therefore, Boomerang's Purchase Options under the Lease do not satisfy the test for *per se* nominal consideration under Section 1.203(d).

21.     Moreover, the prices at which Boomerang could exercise each of its Purchase Options were negotiated in the context of what the parties believed, at the time the Lease was entered into, would be the fair market value of the Equipment at each of the points in time when the options could be exercised. *See* Texas UCC § 1.203(d)(ii) (additional consideration is not nominal with respect to a sale to the lessee if "when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed."). In negotiating the various Purchase Options under the Lease, SBBT measured those options against its expectation of the value of the Equipment, and negotiated the purchase prices accordingly. Indeed, the Debtors presumably will concede that the Purchase Options are for at least the fair market value of the Equipment and therefore are not for nominal consideration.[3]

---

[3] The Debtors maintain that the current fair market value of the Equipment is just $4.5 million. SBBT disputes that low-ball valuation.

iv.    **The Lease Term Does Not Exceed the Remaining Economic Life of the Equipment.**

22.    Finally, the remaining economic life of the Equipment far exceeds the original term of the Lease. *See* Texas UCC § 1.203(b)(1). The Final Purchase Option alone, exceeding $7 million, evidences SBBT's and Boomerang's mutual belief that the Equipment would have substantial remaining value at the end of the Lease term. *See HP Distribution*, 436 B.R. at 690 (concluding that where the lessor and lessee agreed that all of the leased property would have some residual value, in most cases 20% or more of its initial value, "this alone suggest that [lessor] retained some valuable interest in the property at expiration."); *In re Integrated Health Services, Inc.*, 260 B.R. 71, 76 (Bankr. D. Del. 2001) (the useful life of the leased property should be determined as it existed at the time of the transaction). SBBT's calculation and negotiation of Boomerang's various Purchase Options reflected its belief that the Equipment had a useful economic life of at least 15 years, and could be recovered for significant value if Boomerang did not purchase it.

23.    Furthermore, if Boomerang did not purchase or re-let the Equipment, SBBT had both the intention and the economic incentive to repossess the Equipment. At the time of negotiating the Lease, SBBT recognized that the cost to repossess the Equipment at the Lease's end, if not purchased by Boomerang, was economically sensible given the high anticipated residual value of the Equipment. The residual value and remaining economic life of the Equipment, together with SBBT's full intention and economic incentive to repossess it if it was not sold to Boomerang, result in this factor of the bright-line test, like the others, not being satisfied.

D.    **The Economic Realities of the Transaction Evidence that the Lease is not a Disguised Security Agreement.**

24.    If, as is the case here, the Lease is not a *per se* security agreement under the Texas UCC's bright-line test, the Court must then look to the "economic realities" of the transaction between SBBT and Boomerang to determine whether SBBT retained a "meaningful reversionary interest" in the Equipment at the time the Lease was entered into. *HP Distribution,* 436 B.R. at 686 ("[T]he Court must consider the economic realities to determine the fundamental question: whether the lessor retains a 'meaningful reversionary interest' in the property."); *Newsome,* 2003 Bankr. LEXIS 514 at *12-13 ("In effect, Section 1.201(37)(B) relies on the trier of fact to determine whether an arrangement creates a security interest or a lease on a case-by-case basis.").

25.    Courts look to various factors to determine whether the economic realities of a transaction render it a disguised security agreement, including:

> (i) whether the lessee's purchase option at the end of the lease term is for nominal consideration;
>
> (ii) whether the lessee is required to make aggregate rental payments having a present value equaling or exceeding the original cost of the leased property;
>
> (iii) whether the lease term covers the total useful life of the equipment;
>
> (iv) whether the payments due under the agreement were calculated to compensate the lessor for the use of the property, rather than ensure a return on investment;
>
> (v) whether the rent was calculated at market rate;
>
> (vi) whether the obligations of the lessee are those normally associated with ownership; and
>
> (vii) whether the property was purchased for the lessee's use.

*In re Integrated Health Servs., Inc.,* 260 B.R. 71, 76 (Bankr. D. Del. 2001) (applying former

1.201(37) of the Texas UCC) (collecting cases); *Montgomery Ward,* 469 B.R. at 530.

26.     In this case, examination of the economic realities of the Lease transaction also

support a finding that it is a true lease, not a security agreement.

> **i.      The present value of the lease payments due under the Lease do not exceed
> the Total Cost of the Equipment.**

27.     In determining whether an agreement is a lease or a disguised financing, courts

consider whether the aggregate rental payments have a present value exceeding the original cost

of the leased property. *Pillowtex*, 379 F.3d at 719-720 ("The rationale is that if the alleged lessee

is obligated to pay the lessor a sum equal to or greater than the full purchase price of the leased

goods plus an interest charge over the term of the alleged lease agreement, a sale is likely to have

been intended since what the lessor will receive is more than payment for the use of the leased

goods and loss of their value; the lessor will receive a consideration that would amount to a

return on its investment." (*quoting In re Edison Brothers Stores, Inc.,* 207 B.R. 801, 814 (Bankr.

D. Del. 1997)). The calculation of lease payments over the term of the lease should account for

the time value of money.  *Edison Brothers,* 207 B.R. at 815 (under former section 1.201(37) and

case law applying it, this consideration "require[s] not simply a comparison of the aggregate

rental payment to the fair market value (purchase price) of the goods at the commencement of

the lease, but a comparison of the present value of the aggregate rental payments to the fair

market value.").

28.     Here, the present value of Boomerang's lease payments over the life of the Lease

do not exceed the Total Cost of the Equipment, which was $14,217,486 per the Lease Payment

Schedule attached to the Lease.[4] Rather, the present value of the total lease payments is nearly $800,000 less than the Total Cost of the Equipment. The below chart illustrates the aggregate lease payments Boomerang was obligated to make under Section 6(b) of the Lease,[5] in absolute dollars and discounted to present value (using the 12% internal rate of return the parties agreed to).

| Years | Monthly Rent | Total (Absolute Dollars) | Discount Rate | Present Value | Equipment Cost Variance |
|-------|--------------|--------------------------|---------------|---------------|-------------------------|
| 1 – 5 | $236,608 | $14,196,480 | 12% | $10,636,722 | ------------------ |
| 6 – 7 | $132,441 | $3,178584 | 12% | $22,813,495 | ------------------ |
| Total Rent | ------------ | **$17,375,064** | ----------- | **$13,450,217** | ($767,269) |

29.    As the chart shows, taking into account the agreed 12% rate of return, the present value of the total lease payments made during the lease term is some $767,000 less than the Total Cost of the Equipment. Thus, Boomerang was not required to make aggregate rental payments having a present value equaling or exceeding the original cost of the Equipment. This factor supports a finding that the Lease is not a disguised financing.

**ii.    The lease payments were calculated to compensate SBBT for the use of the Equipment, not to guarantee SBBT a total return on investment.**

30.    The lease payments Boomerang was to pay under the Lease were calculated to equal "an amount that would yield an internal rate of return of 12% per annum on the Total Cost." Lease at § 6(b). This calculation, however, was not structured to give SBBT a total return on its investment. Rather, it represents the parties' negotiated agreement on a rate of return that

---

[4] The Total Cost under the Lease was $13,000,000.00 plus $1,217.486.00 in accrued interest.

[5] Section 6(b) of the Lease sets forth the Lease Payments: "During the Lease Term, Lessee will make monthly lease payments ("**Lease Payments**") to Lessor equal to an amount that would yield an internal rate of return of 12% per annum on the Total Cost. A detailed Lease Payment Schedule will be prepared by Lessor and approved by Lessee upon Lessor's final payment for the Equipment." Lease at § 6(b).

was lower in comparison to the interest rate Boomerang could get for capital from a private equity source, and higher in comparison to the interest rate Boomerang would have gotten for financing from a traditional lending source, had Boomerang been able to qualify for traditional financing (which it was not). Thus, the 12% agreed rate of return was a product of the cost of capital at the time the Lease was entered into.

31.     That the lease payments were not structured to give SBBT a total return on its investment is also evidenced by the fact that the present value of the aggregate lease payments was less than the Total Cost of the Equipment. Moreover, as discussed above, the parties attributed a residual value to the Equipment of more than $7 million at the end of the Lease term. This valuation makes clear that a complete return on SBBT's investment necessarily included return or sale of the Equipment, and would not be accomplished by Boomerang's lease payments alone. Finally, the lease payments represented the market rate for leasing the equipment. *See Integrated Health,* 260 B.R. at 77 (finding testimony stating that the rent was a reasonable market rate at the time of the transaction supportive of the court's conclusion that the agreements were true leases).

32.     As the above demonstrates, the lease payments were calculated to compensate SBBT for Boomerang's use of the Equipment over the first seven years of its life, not to guarantee SBBT a total return on its investment in the Equipment. This factor thus supports a finding that the Lease is not a disguised financing.

**iii.     The default provisions of the Lease give SBBT rights greater than a secured creditor under the UCC.**

33.     The nature of the Lease as a true lease rather than a financing is also evident in the provisions governing the parties' rights in the event of Boomerang's default. Section 22 of

the Lease addresses SBBT's remedies upon an event of default, providing that SBBT may exercise one or more of the following remedies:

> (a)     enter the premises where the Equipment or the Collateral is located and take possession of it by summary proceedings or otherwise without liability to Lessee or others;
>
> (b)     **sell all or any part of the Equipment or the Collateral at public or private sales, with or without notice, or re-lease or otherwise dispose of it and apply the net proceeds of the sale, re-lease or other disposition (after deducting the costs and expenses of the sale or re-lease, such as costs of repossession, transportation, storage repairs, broker's fees, and all of Lessor's legal charges for in-house and external legal services) to Lessee's obligations to Lessor under this Lease, with Lessee remaining liable for any deficiency**;
>
> (c)     immediately exercise the Sale Option;
>
> (d)     declare immediately due and payable all amounts due and to become due under this Lease (including all amounts due upon Lessor's exercise of the Sale Option) and sue for and recover from Lessee all such amounts; and
>
> (e)     exercise or pursue any remedy at law or in equity, including specific performance and any remedies available to Lessor under the UCC.

Lease at § 22 (emphasis added).

34.     Section 22(b) of the Lease provides that upon Boomerang's default, SBBT is entitled, among other things, to sell the Equipment and apply the proceeds to Boomerang's obligations under the Lease, with Boomerang remaining responsible for any deficiency. Tellingly, the Lease does not entitle Boomerang to sale proceeds in excess of its Lease obligations.

35.     Moreover, Section 13(b) of the Lease, addressing certain waivers by Boomerang, provides that "To the extent permitted by applicable law, Lessee also hereby waives any rights now or hereafter conferred by statute or otherwise which may require Lessor to sell, lease or

otherwise use any Equipment in mitigation of Lessor's damages or which may otherwise limit or modify any of Lessor's rights or remedies under this Lease." Lease at § 13(b). Together, by allowing SBBT to sell the Equipment without recognizing any right of Boomerang to excess proceeds and by waiving Boomerang's rights with respect to SBBT's obligations to mitigate damages, these provisions provide SBBT with rights greater than those given to a secured creditor under the Texas UCC. This is buttressed by the fact that the Lease provides that "the Equipment is and at all times during the term of this Lease will remain Lessor's sole and exclusive personal property. Lessee will have no right, title or interest in the Equipment, other than the right to maintain, possess and use the Equipment during this Lease Term, but only if and so long as Lessee complies with all of the terms and conditions of this Lease." Lease at § 10.

36.    The default provisions of the Lease, granting SBBT unilateral rights to repossess and sell the Equipment without accounting to Boomerang for any excess sale proceeds, while at the same time providing Boomerang no rights in the sale proceeds, evidences a true lease, not a security agreement. *See Edison Brothers,* 207 B.R. at 820 (finding that the default provisions at issue gave the lessor rights greater than a secured creditor under the UCC, supporting the conclusion that the agreement was not a security agreement, where, among other things, the lessor was entitled to keep all the proceeds from a sale following repossession, without an obligation to account to the debtor for any possible equity in the equipment).

iv.    **This Court has previously discounted the importance of other factors courts have considered in the economic realities analysis.**

37.    In other similar cases, this Court has viewed with skepticism certain factors—considered by some courts in the economic realities analysis—that the Debtors may argue support a finding of a disguised financing.

38.     Some courts have considered whether the lessee assumes indicia of ownership, such as assuming the risk of loss of the goods and agreeing to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs. *Integrated Health Services,* 260 B.R. at 76 (identifying factors courts have considered in the economic realities analysis). Here the Lease includes similar terms that the Debtors may argue support a finding that the Lease is a disguised financing. This Court, however, has recognized that such terms are not truly indicative of a disguised financing, but rather are simply the product of negotiations and bargaining power. *Integrated Health,* 260 B.R. at 77 (in finding that leases of nursing home facilities were true leases, rejecting the argument that because the lessee paid all costs related to the premises including the mortgage, taxes and utilities, it had assumed the usual obligations of ownership such that the agreement was a disguised financing arrangement); *Edison Brothers*, 207 B.R. at 818 (finding the agreement at issue to be a true lease, stating "I place little weight on the fact that debtor assumed many of the obligations associated with outright ownership of the equipment, namely, obligations to pay taxes, to pay insurances, to pay maintenance expense, to indemnify the lessor, and to assume all risks. These factors are necessarily borne by one party or the other and therefore they reflect less the true character of the transaction than the strength of the parties' respective bargaining positions.") (internal quotations omitted).

39.     Courts have also considered whether the leased equipment was bought by a lessor solely for the lessee's use. To the extent the Debtors argue that the Equipment was bought solely for Boomerang's use, however, the Court should reject this argument as well. Although SBBT did purchase the Equipment solely for Boomerang's use, and in fact Boomerang selected the Equipment, this is simply one feature of a potential finance lease, and is not alone determinative of whether an agreement is a security agreement. *Edison Brothers*, 207 B.R. at 821-22 (finding

that the lease there, where the lessor purchased equipment to be installed at lessee's facilities for the lessor's use, was a true lease, and concluding that the lessor's role as the financier, rather than the manufacturer of the goods at issue, was inconclusive, if not irrelevant, to whether the lease was a secured financing); *see also Triplex Marine,* 258 B.R. at 672 n.24 (in finding that a purported finance lease was a disguised security agreement under the Texas UCC, distinguishing the transaction at issue from a typical finance lease: "There was no third party supplying the equipment in this transaction. Nor was the transaction limited to specified or particular equipment or inventory. … Under these circumstances, this was not a typical finance lease. It was typical financing, disguised as a lease.").

40.      Another factor that courts have considered is how the parties accounted for the transaction in their books and records. The Debtors may argue that because Boomerang and SBBT each treated the Lease as a capital lease for accounting purposes, rather than an operating lease, this is indicative of a disguised financing. The parties' accounting treatment of a transaction, however, is at best indicative of intent rather than the true nature of the transaction, and this Court has recognized that the intent of the parties is not relevant to the analysis. *See Homeplace Stores,* 228 B.R. at 91 (recognizing that the lessor treated the agreement as a capital lease and the lessee treated it first as an operating lease and then as a capital lease, but concluding that under former section 1.201(37) the economic realities of the transaction govern the analysis, not the intent of the parties). Rather, the characterization of the Lease for accounting purposes is properly viewed only as one piece of the economic realities analysis, which as discussed above, supports a finding that the Lease is a true lease. *Cf. Ecco Drilling,* 390 B.R. at 231 n.42 (in finding that the agreement at issue was a disguised security agreement because the option price was nominal, noting that both parties treated the agreement as a capital lease for

accounting purposes, but observing that "[w]hile accounting and tax treatments do not necessarily dictate legal characterizations, the evidence establishes that these treatments are imposed in recognition of the economic realities of the transaction.").

41.     As the above discussion illustrates, the overall economic realities of the transaction between SBBT and Boomerang evidence a true lease, not a disguised financing. Because neither the terms of the Lease nor the law support recharacterizing the Lease as a disguised financing, the Court should reject the Debtors' attempt to do so under their proposed Plan.

## II.     *The Plan's Proposed Treatment of SBBT's Claim Is Not Fair and Equitable.*

42.     Section 1129(b)(1) of the Bankruptcy Code provides that a plan can only be "crammed down" over the objection of a class of objecting creditors if the plan is fair and equitable. 11 U.S.C. § 1129(b)(1). A plan is fair and equitable as to a class of secured claims where the plan provides "that each holder of [a secured claim] receives on account of such claim deferred cash payments totaling at least the allowed amount of such claim of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(a)(i)(II).

43.     The Supreme Court of the United States has interpreted § 1129(b)(2)(A)(i)(II) to require that a secured creditor, whose claim is paid over time, be paid in installments "calibrated to ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds the value of the allowed claim." *Till v. SCS Credit Corp.*, 541 U.S. 465, 469 (2004).

A.    **The Proposed 4.0% Interest Rate Is Far Below a Fair and Equitable Market Rate.**

44.    To determine whether the present value of the proposed payments is equal to the value of the creditor's secured claim, the Court must determine the appropriate interest rate under the circumstances. The Bankruptcy Code provides no guidance for calculating an appropriate interest rate in the context of a cramdown. In 2004, a plurality decision of the Supreme Court in *Till* held that bankruptcy courts must calculate the chapter 13 cramdown rate in a formulaic way by starting with the national prime rate and adjusting the rate upward based on the risk of nonpayment. 541 U.S. at 465. However, because of the differences between chapters 11 and 13—primarily the increased availability of alternative financing in chapter 11— the Court suggested that "in a chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Id.* at 477 n. 14.

45.    Following the Supreme Court's guidance, in determining the appropriate cramdown rate, most courts, including courts in this Circuit, begin the analysis by asking "what rate an efficient market would produce" and apply that rate if such a market exists. *See Till*, 541 U.S. at 479; *In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010) (relying on market rates to determine appropriate cramdown interest rate); *Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559, 568 (6th Cir. 2005) (holding that a market rate should be applied in chapter 11 cramdown cases where an efficient market exists); *In re 20 Bayard Views, LLC*, 445 B.R. 83, 107-08 (Bankr. E.D.N.Y. 2011) (recognizing that most courts begin cramdown rate analysis by analyzing whether an efficient market rate exists). Only if an efficient market does not exist do courts then determine the appropriate rate by the "formula" approach adopted by the Supreme Court in *Till. See In re G-1*

*Holdings Inc.*, 420 B.R. 216 (D.N.J. 2009); *In re Cantwell*, 336 B.R. 688 (Bankr. D.N.J. 2006);

*In re Prussia Assocs.*, 322 B.R. 572 (Bankr. E.D. Pa. 2005).

46.     In this case, Boomerang's Plan fails to provide SBBT with an adequate interest rate to satisfy the fair and equitable requirement. To begin, the rate Boomerang proposes to pay SBBT on account of its secured claim—four percent—is far below the market rate. The Plan provides SBBT with the "SBI Secured Note" which has a seven-year term and is secured by the Heat Treat Line Collateral (as defined in the Plan). Essentially, the Plan proposes SBBT make Boomerang an equipment loan with 100% LTV. An analysis of asset-based and leverage-based financing transactions for equipment and in the oil and gas and steel industry over the last one to three years establishes that the market rate for a loan similar to the Plan's loan is between 5.2 and 5.85%. *See* Expert Report of Taylor West, CVA, Duff & Phelps, LLC, dated September 2, 2015, at 12.

47.     Boomerang's Plan likewise fails to provide SBBT an adequate interest rate under *Till*'s formula approach. In *Till*, the Supreme Court required that chapter 13 plan distributions to secured creditors bear interest at the prime-rate, plus an appropriate "risk premium" based on the circumstances of the estate, the nature of the security, and the duration and feasibility of the debtor's reorganization plan. *Till*, 541 U.S. at 479. As part of the "risk premium" analysis, courts have considered the nature and value of the collateral, whether the collateral is appreciating, the size of the debtor's equity cushion, the debtor's operations, and the plan duration. *See, e. g.*, *In re Cantwell*, 336 B.R. at 693 (in assessing risk premium considered plan duration and size of equity cushion); *In re Prussia Assocs.*, 322 B.R. at 589 (in assessing risk premium considered appreciating nature of lender's collateral and debtor's operations).

48.     Courts in this Circuit have followed the majority of courts in approving risk premiums of one-to-three percent above the prime rate. *In re South Canaan Cellular Invs. Inc.*, 427 B.R. at 78 (approved prime-plus 2.75%); *In re Cantwell* at 693 (approved prime-plus 1%); *In re Prussia Assocs.*, 322 B.R. at 589 (approved prime-plus 1.5%). Court have required a debtor to pay prime plus one percent in cases with "negligible" risk, and prime plus one-and-a-half percent in cases where the risk attendant to the plan was neither "negligible nor extreme." *See In re Cantwell*, 336 B.R. at 693; *In re Prussia Assocs.*, 322 B.R. at 589.

49.     The rate Boomerang proposes—prime plus 0.75%—is woefully inadequate to compensate SBBT for the risk attendant to the Plan. The Plan proposes a loan with 100% LTV. Boomerang  asserts that the Heat Treat Line Collateral is depreciating. There is no way to predict the future value of the Heat Treat Line Collateral. Boomerang's own CFO testified that the Heat Treat Line Collateral "could wear out in four years or  . . . last for twenty years" depending on maintenance and wear and tear. Deposition of Jason Roberts, at 63:2-7. The Plan places SBBT at more than "negligible" risk. Given the risk, SBBT's expert has opined that a rate of prime plus 1.90-2.60% is warranted and well within a reasonable range approved by the Supreme Court as well as other courts in this Circuit.  *See* Expert Report of Taylor West, CVA, Duff & Phelps, LLC, dated September 2, 2015, at 13.

**B.     The Proposed Valuation of the Equipment at $4.5 Million Is Far Below the Equipment's Fair Market Value, Which Is at Least $12,638,000.**

50.     The Debtors' proposed plan of reorganization also fails the fair-and-equitable test of § 1129 because it provides for allowance of SBBT's secured claim at a value—$4.5 million— that is far below the Equipment's actual value, which SBBT will prove is at least $12,638,000.

51.     Section 506(a) of the Bankruptcy Code provides that:

> An allowed claim of a creditor secured by a lien on property in
> which the estate has an interest … is a secured claim to the extent

of the value of such creditor's interest in the estate's interest in such property … and is an unsecured claim to the extent that the value of such creditor's interest … is less than the amount of such claim. **Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.**

11 U.S.C. § 506(a) (emphasis added).

52.     Courts have acknowledged that "Congress envisioned a flexible approach to valuation whereby bankruptcy courts would choose the standard that best fits the circumstances of a particular case." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012) (citing H.R. Rep. No. 95-595, at 356 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5787, 6311). Although bankruptcy courts have some latitude in applying valuation standards, the Supreme Court of the United States has made it clear that "the 'proposed distribution or use' of the collateral is of paramount importance to the valuation question." *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997). In other words, "the appropriate standard for valuing collateral must depend upon what is to be done with the property—whether it is to be liquidated, surrendered, or retained by the debtor." *Heritage Highgate*, 679 F.3d at 141.

53.     As the Third Circuit explained in *Heritage Highgate*, "[w]here a Chapter 11 plan of reorganization provides for a debtor to retain and use collateral to generate income with which to make payments to creditors, a § 506(a) violation based upon a hypothetical foreclosure sale would not be appropriate, as it would be inconsistent with the provision's dictates." *Id.* at 141-42. Further, the Court in *Heritage Highgate* established that where a Chapter 11 plan provides for the debtor to retain and use collateral to generate income with which to make payments to creditors, "[t]he proper measure [of value] under §506(a) must … be the collateral's fair market value because it is most respectful of the property's anticipated use." *Id.* at 142; *see also Taffi v. United States (In re Taffi)*, 96 F.3d 1190, 1192 (9th Cir. 1996) (en banc), (establishing that when

the debtor intends to retain the property, "valuation must be accomplished within the actual situation presented."); *accord Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries, Inc.),* 50 F.3d 72, 75 (1st Cir. 1995) ("a court remains faithful to the dictates of § 506(a) by valuing the creditor's interest in the collateral in light of the proposed post-bankruptcy reality."); *see also Ardmor Vending Co. v. Kim (In re Kim)*, 130 F.3d 863, 865 (9th Cir. 1997) (explaining that "valuation is to depend on the use or disposition to be made of the interest, which in this case means the continued operation of the business in the same location.").

54.    In this case, the Debtors have indicated an intent to keep the Equipment and its income stream as a vital part of the Debtors' reorganized business operations. SBBT's experts have appropriately valued the Equipment (as of August 25, 2015) at $12,638,000 with that intended use factored into their analysis. The Debtors' expert, on the other hand, improperly assumed that the Equipment would be sold. This is an assumption that has no basis in fact and is directly contrary to the Debtors' contemplated use of the Equipment under the plan. The Debtors assert that the value of the Equipment is $4.5 million based upon application of a "Fair Market Value—removal" valuation standard.[6] The Debtors have defined this standard as the amount at which the Equipment would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts, considering removal of the property to another location, as of a specific date. The Debtors' reliance on this "removal" valuation standard is clearly misplaced because the Debtors

---

[6] Even if the Court were to accept "Fair Market Value—Removal" as the appropriate valuation standard for the Equipment, which SBBT submits it should not, there are serious errors by the Debtors' expert in the application of that standard which, if corrected, would yield a valuation of $9,360,000.00 for the Equipment under that valuation standard.

intend to continue using the Equipment in its current location and do not contemplate any such removal.

55.     Because the Debtors intend to use the Equipment for years into the future, the Court should take that use into account in choosing a valuation method and should use the valuation determined by SBBT's experts in establishing the value of SBBT's secured claim for treatment under the Plan. The Third Circuit has established that the initial burden is placed on the party challenging the value of a secured claim because section 502(a) and Bankruptcy Rule 3001(f) grant *prima facie* effect to the validity and amount of a properly filed claim. *In re Heritage Highgate, Inc.*, 679 F.3d at 140. Only if the movant establishes with sufficient evidence that the proof of claim overvalues a creditor's secured claim does the burden then shift to the creditor who is to demonstrate the value of the collateral securing its claim. *Id.* Here, the Debtors have the burden of proof with respect to their allegation that SBI's Secured Claim is overvalued. In this case, where the Debtors' valuation of the Equipment is significantly discounted by the hypothetical removal of the Equipment to another location—removal that is not contemplated by the Debtors under its Plan—the Debtors cannot sustain their burden of proof with respect to their $4.5 million valuation.

56.     The approach that best takes into consideration the Debtors' proposed continued use of the Equipment is a fair-market valuation standard that relies on a "continued-use" premise and assumes that the buyer and the seller would be contemplating retention of the assets as installed at their present location as part of the current operations.  In order for the court to remain faithful to section 506(a)'s "proposed disposition or use" language, the value prescribed to the Equipment must be based upon the assumption that the Debtors are retaining the Equipment at their present location as part of current operations.

57.    There is no reason to discount the value of the Equipment for removal when no such removal is contemplated. As such, the Debtors' "removal" standard simply disregards the Debtors' anticipated use of the Equipment in its current location. As the Supreme Court of the United States has explained, "[s]ection 506(a) calls for the value the property possesses in light of the 'disposition or use' in fact 'proposed,' not the various dispositions or uses that might have been proposed." *Rash*, 520 U.S. at 964. Instead, given these facts and the precedential holding of *Heritage Highgate*, the court should determine that the Equipment's fair market value, based on the Debtors' proposed continued use, is $12,590,518.64.

**C.    The Plan's Proposed Treatment of SBBT's Claim If SBBT Takes the § 1111(b) Election Is Neither Fair and Equitable Nor Feasible.**

58.    The Debtors' proposed Plan provides that, although SBBT will receive payment on the SBBT Secured Note, if SBBT takes a § 1111(b) election, SBBT will receive no payment on account of its total nominal claim until the 12th anniversary of the Effective Date of the Plan, at which time SBBT will receive a single balloon payment. Such treatment is without precedent or support in the case law, and is—on its face—not fair and equitable. Nor is it feasible. The Debtors' proposed treatment of SBBT if, as is now the case, SBBT takes the § 1111(b) election unfairly and improperly places the risk that the Debtors' Plan might fail—at any point in the next twelve years—squarely on SBBT. The Debtors cannot show that their proposed treatment is either fair or feasible (and they have to prove both). Accordingly, the Plan should not be confirmed.

59.    The Bankruptcy Code's "feasibility requirement mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both its operations and its obligations under the plan." *In re American Consol. Tramp. Cos., Inc.,* 470 B.R. 478, 489 (Bankr. N.D. Ill. 2012) (citing *Coones v. Mut. Life Ins. Co. of N.Y.,* 168 B.R. 247, 255 (D. Wyo.

1994). In determining feasibility, a plan proponent must show a reasonable assurance of commercial viability. *In re 203 N. LaSalle St. P'ship,* 126 F.3d 955, 961-62 (7th Cir. 1997). In making this determination, the court may examine: (i) the adequacy of the capital structure; (ii) the earning power of the business; (iii) economic conditions; (iv) the ability of the management; (v) the probability of the continuation of the same management and (vi) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re U.S. Truck Co., Inc.* 800 F.2d 581, 589 (6th Cir. 1986).

60.    In assessing the feasibility of long-term balloon payments to satisfy the claims of creditors taking a § 1111(b) election, courts generally have looked upon them with disfavor. *See, e.g.*, *In re Executive House Assocs.*, 99 B.R. 266, 281-82 (Bankr. E.D. Pa. 1989) (holding that the Bankruptcy Code does not allow a debtor "to make use of the property for many years and retain a significant portion of the proceeds, while relegating the creditor to look to the collateral at the end of that period for the recovery of most of its claim."); *In re S.E.T. Income Properties, III*, 83 B.R. 791, 793 (Bankr. N.D. Okla. 1988) (rejecting proposed 15-year balloon payment as infeasible); *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 493-94 (Bankr. S.D. Ohio 2011) (recognizing that in "some cases" the debtor's real property could provide the source for a long-term balloon payment but rejecting the debtor's proposed 30-year balloon payment as infeasible without evidence of the expected value of the property at the time the balloon payment would be due and the ability of the debtor to make the payment at that time).

61.    Although some courts have allowed lump-sum balloon payments to be paid in satisfaction of a claim made by a creditor exercising its § 1111(b) election, each of those cases involves real property on which payment over a very long period was the expectation of the

parties involved and not unreasonable given the stable value of the real-property asset securing the claim.

62.    With two exceptions not applicable in this case, § 1111(b) of the Bankruptcy Code provides secured creditors such as SBBT with the right to elect to have their full claims treated as secured to the full extent their claims are allowed. 11 U.S.C. § 111(b)(2). In August 2015, SBBT timely filed a $12,590,518.64 proof of claim. Under § 1111(b), SBBT has a right to have its full $12,590,518.64 claim treated as secured.

63.    The Debtors have asserted that the Equipment securing SBBT's claim has diminished in value in just a few years from more than $13 million to its current value of just $4.5 million.[7] At the same time, the Debtor's Plan proposes to make a lump-sum payment at the end of 12 years, presumably from funds generated by the very Equipment they claim has rapidly diminished in value and has an uncertain number of years of useful life remaining. *See* Deposition of Jason Roberts, at 63:2-7.

64.    The Debtors have produced no evidence—and are unable to produce any evidence—that the value of the Equipment at the time the proposed balloon payment comes due in the year 2027 will be sufficient to secure the payment. Nor can they possibly provide any reliable projections concerning the company's expected financial condition twelve years from now. Lazard has made no such projections, and the Debtors' own CEO Kevin Nystrom, admitted that the Debtors' Plan only makes financial projections for five years. (Nystrom Dep. 18:17-20). For these reasons, the Debtors' Plan with respect to its treatment of SBBT's claim if, as is now the case, SBBT elects to have its claim treated under § 1111(b) is not confirmable.

---

[7] SBBT disputes the Debtors' low-ball valuation of the Equipment.

65.     Accordingly, SBI requests that the Plan be amended to provide for payment of the full amount of SBBT's claim in equal monthly installments beginning on the Effective Date and continuing over a period of no more than seven years from the Effective Date.

**D.     The Plan Improperly Subordinates SBBT's Secured Claim to a Non-Existent Claim, Depriving SBBT of the Full Value of its Claim.**

66.     In its recently amended plan, Boomerang curiously added a claim in favor of SBBT's lender, Wells Fargo Equipment, as a secured claim *against Boomerang*, and reduced SBBT's claim against Boomerang by the amount of the newly created Wells Fargo Equipment claim.[8] *See supra*, note 1 and accompanying text. However, Wells Fargo Equipment has not asserted any claims against Boomerang. Wells Fargo Equipment financed SBBT's purchase of the Heat Treat Line Collateral, which SBBT leased to Boomerang. Although Wells Fargo Equipment has a security interest in the equipment, that interest is a result of the financing arrangement between SBBT and Wells Fargo Equipment. *Boomerang has no direct agreements with Wells Fargo Equipment.* Well Fargo Equipment has not even filed a proof of claim in Boomerang's bankruptcy case.[9] Any claim Wells Fargo Equipment may have against Boomerang is contingent and completely derivative of SBBT's claims. By substituting SBBT's claim with that of its lender, the Plan denies SBBT the value of its secured claim and is not

---

[8] On August 10, Boomerang filed amended schedules listing Well Fargo Equipment Finance, Inc. as the holder of a contingent, unliquidated and disputed secured claim, but did not list any collateral or a claim amount. *See* Boomerang's Amended Schedule D filed August 10, 2015. The recently-filed amended plan adds provides SBB Tubular with the "*SBI Secured Note*" and, in the case of SBB Tubular making an 1111(b) election, the "*SBI Nonrecourse Note*" which note amounts shall be "less the amount of the Allowed SBI Lender Secured Claim." *See* Plan, 1.1.145, 1.1.147, and 3.2(e). The Plan defines the "*SBI Lender*" to mean Wells Fargo Equipment Finance, Inc. and the "*SBI Lender Secured Claim* as "the Claim against SBI arising under the SBI Lender Financing Agreement, to the extent such Claim is secured by a Lien in the SBI Heat Treat Line Collateral . . . ." Plan, 1.1.142 and 144. The "*SBI Lender Financing Agreement*" is defined as an agreement dated September 12, 2011, by and between SBI and the SBI Lender. *Id.* at 1.1.143.

[9] Wells Fargo Capital Finance, LLC., a completely separate entity from Wells Fargo Equipment Finance, Inc., has filed several claims entirely unrelated to the SBI's claim, the Lease, or the Equipment.

confirmable. Further, there can be no dispute that SBBT's UCC-1, filed of record on February 23, 2011 predates the filing by Wells Fargo on September 14, 2011 at 5:31 PM. *See* UCC-1 of Wells Fargo against Boomerang Tube and UCC-1 of SBBT Accordingly, it is improper for the Debtors' proposed plan to provide that Wells Fargo Equipment has a first lien in the Heat Treat Line Collateral.

## CONCLUSION

For the reasons stated herein, SBBT respectfully requests that the Court deny confirmation of the Debtors' Plan as currently drafted.

WHEREFORE, SBBT respectfully requests relief consistent with this Objection and for such other and further relief as may be just.

Date:    September 14, 2015  
       Wilmington, DE

Respectfully submitted,

PEPPER HAMILTON LLP

/s/ David M. Fournier  
David M. Fournier (DE No. 2812)  
Michael J. Custer (DE No. 4843)  
Hercules Plaza, Suite 5100  
1313 N. Market Street  
P.O. Box 1709  
Wilmington, Delaware 19801-1709  
Telephone: (302) 777-6500  
Facsimile: (302) 421-8390  
Email: fournierd@pepperlaw.com  
       custerm@pepperlaw.com

and

Judith W. Ross, Esquire  
Eric Soderlund, Esquire  
Law Offices of Judith W. Ross  
700 North Pearl Street, Suite 1610  
Dallas, Texas 75201  
Telephone: 214-377-7879  
Facsimile: 214-377-9409  
Email: Judith.ross@judithwross.com  
Email: eric.soderlund@judithwross.com

ATTORNEYS FOR SB BOOMERANG TUBULAR, LLC and PINNACLE MACHINE WORKS, LLC