### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOOMERANG TUBE, LLC, a Delaware limited liability company., *et al.*,[1] | Case No. 15-11247(MFW) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I.: 377, 470** |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO CONFIRMATION OF AMENDED JOINT PREARRANGED CHAPTER 11 PLAN OF BOOMERANG TUBE, LLC AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned proceedings (the "Chapter 11 Cases" or "Cases") of Boomerang Tube, LLC, *et al.* (referenced alternatively herein as "Boomerang," the "Debtors," or the "Company"), by and through its proposed co-counsel, respectfully submits this objection (this "Objection") to confirmation of the *Debtors' Amended Joint Prearranged Chapter 11 Plan* [D.I. 470] dated September 14, 2015 (the "Plan"). In support of its Objection, the Committee simultaneously files and incorporates herein by reference the documents attached as Exhibits hereto, and respectfully states as follows:

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Boomerang Tube, LLC (9415); BTCSP, LLC (7632); and BT Financing, Inc. (6671). The location of the Debtors' corporate headquarters is 14567 North Outer Forty, Suite 500, Chesterfield, Missouri 63017.

## PRELIMINARY STATEMENT

### I.      Valuation In Dispute.

1.      At its core, these Cases boil down to one question: in light of the recent record decline in West Texas Intermediate ("WTI") crude oil prices stressing so many chapter 11 debtors today, will the Court accept the Debtors' thesis that a once-profitable business has been permanently disabled by fluctuations in oil prices and, in so doing, permit the Debtors' Term Lenders to walk away from these Cases with value in excess of their claims?

2.      The facts relevant to this Objection have been recited at length in these Cases and need not be belabored herein.  In brief, the Debtors are a leading domestic manufacturer of Oil Country Tubular Goods ("OCTG"), which are used by drillers in the exploration and production of oil and natural gas.  In FY2014, the Debtors posted net revenue of $491.0 million, adjusted EBITDA of $42.0 million, and a $60.0 million gross profit.  But beginning in June 2014, WTI prices fell from $107 per barrel to a low of $44 per barrel in January 2015.  This development caused the Debtors' customers to throttle back on their purchases of the Debtors' products, which culminated on March 4, 2015 in the Debtors' ABL Facility Agent delivering a notice of an event of default.  At around this time, the Debtors commenced restructuring discussions with their secured lenders.  On May 6, 2015, the Debtors' Board and senior management unanimously approved a plan support agreement (the "May 6 PSA") that contemplated, among other things, the repayment in full of the Debtors' unsecured creditors.

3.      Shortly thereafter, however, the Debtors shelved the May 6 PSA.  On June 8, 2015, the Debtors inked a revised plan support agreement (the "PSA") with the Plan Support Parties, which, in an abrupt departure from the May 6 PSA, proposed a zero recovery for unsecured creditors.  One day later, on June 9, 2015, the Debtors commenced these Cases.

Although the Committee's postpetition engagement with the Debtors has resulted in a marginal improvement in unsecured creditors' treatment under the recently-amended September 4th Plan, the thrust of the Plan has remained constant: the Term Lenders walk away with the keys to the Reorganized Company, while unsecured creditors are sent packing with a *de minimis* (and potentially zero) recovery.

4.      Worse yet, the Debtors made all of these decisions without ever commissioning a valuation of their enterprise or conducting an adequate "market check."   True, the Debtors retained Lazard on May 4th to undertake an accelerated marketing process for the sale of the Company.   However, potential buyers were given only until June 1st to perform diligence and submit indications of interest, in no small part because the Term Lenders refused to fund a fulsome sale process.   Furthermore, Lazard was specifically instructed ***not*** to conduct a valuation of the Company prior to the commencement of these Cases.   In fact, the Lazard Valuation (defined below) was not delivered in final form until September 2nd—86 days after the PSA was executed and 19 days after approval of the Disclosure Statement.   Unsurprisingly, the Lazard Valuation purports to validate the Debtors' oft-repeated view that the Reorganized Debtors' total enterprise value ("TEV") is too low to provide a meaningful recovery to unsecured creditors.

5.      As discussed more fully below, the Lazard Valuation is premised upon certain deficiencies that make its conclusions of value unreliable.   The Committee's testifying expert from its financial advisor at Alvarez & Marsal has prepared a valuation analysis that, by applying the three generally accepted valuation methodologies and correcting Lazard's unduly conservative assumptions, demonstrates that the Reorganized Debtors' TEV is in a range between $312.0 million and $361.0 million, with a midpoint of $335.0 million.   At these

3

valuation levels, a surplus value over the Debtors' Funded Debt Hurdle (as defined below) exists, which surplus value should inure to the benefit of unsecured creditors—not the Term Lenders.

6.      Indeed, it is now apparent that in negotiating the Plan[2], the Debtors took the all-too-common route of handing over to their most vocal secured creditors all of their reorganized equity during an industry depression, and then claiming that unsecured creditors are simply "out of the money."  The Debtors' valuation thesis boils down to this: because WTI prices plunged from $107 per barrel in June 2014 to $60 per barrel as of the filing of these Cases, Boomerang's enterprise value is now proportionally less, and what value is left must be handed directly to the Term Lenders with no meaningful distribution to general unsecured creditors.  In other words, the Term Lenders seek a strict foreclosure upon their collateral, but one that bears this Court's imprimatur and the protections of the chapter 11 process.

7.      Of course, this argument proves too much.  It is not news that global oil prices fluctuate, often drastically so.  If some global crisis causes WTI to skyrocket by week's end, will the Debtors adopt the view that their enterprise value has similarly surged?  In any case, the Debtors' extrapolation into perpetuity of the currently-depressed OCTG market does not square with fundamental valuation theory, which requires that a debtor's "normalized," or "steady-state" (i.e., non-cyclical) cash flow be used to ascertain value.

8.      Furthermore, the *de minimis* recovery proposed under the Plan for Class 6 General Unsecured Claims betrays a wholesale abdication by the Debtors of their obligation to maximize recoveries for <u>all</u> creditors, not just a favored few.  Problematically, the Plan's premium treatment of the Term Lenders comes at the expense of unsecured creditors.  Under the Plan, unsecured creditors receive distributions only through the creation of a post-Effective Date

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

liquidation vehicle, the GUC Trust, which is to be seeded with only $25,000 of initial funding with which to pursue the Debtors' Avoidance Actions. This speculative recovery is bad enough, but is made worse because the Debtors have arrogated to themselves a first priority right to use GUC Trust Proceeds to reimburse themselves for the initial funding <u>and</u> all Allowed Professional Claims in excess of budgeted amounts. Understood in this context, the GUC Trust amounts to little more than another avenue through which the Debtors can reach into the pockets of unsecured creditors.

9.      By providing value to the Term Lenders in excess of the value of their claims, the Plan violates the absolute priority rule and, therefore, its treatment of Class 6 General Unsecured Claims is not "fair and equitable" under Section 1129(b)(1) of the Bankruptcy Code. This Court should not countenance the Debtors' attempt to feather the Term Lenders' nest at the expense of unsecured creditors. <u>See</u> <u>In re UAL Corp.</u>, 412 F.3d 775, 778 (7th Cir. 2005) (Easterbrook, C.J.) ("[B]ankruptcy is not supposed to appropriate some investors' wealth for distribution to others."). For this reason alone, the Plan may not be confirmed.

## II.    Other Significant Confirmation Objection Points.

10.     In addition to failing the "fair and equitable" standard of Bankruptcy Code Section 1129(b)(1), the Plan also may not be confirmed for five additional reasons:

- <u>First</u>, the Plan's proposed Debtor Releases and Exculpation Provision contravene applicable law. The Debtor Releases of certain parties—in particular Access, the Term Lenders, the ABL Lenders, and the Debtors' officers and directors—are unenforceable because (i) these parties have not made a substantial contribution to the Plan and (ii) releasing these parties is not necessary to the reorganization. To the extent the Debtors seek to release certain Released Parties from Avoidance Action liability, the Debtor Releases contradict this Court's order that <u>all</u> Avoidance Actions belong to unsecured creditors. Finally, the Plan's Exculpation Provision is impermissibly broad insofar as it seeks to exculpate parties that did not occupy a fiduciary role during these Cases.

- <u>Second</u>, the improvement in position orchestrated by the ABL Lenders during the 90 days prior to the commencement of the Debtors' Cases constitutes an avoidable preference under Section 547 of the Bankruptcy Code, which the Committee has standing to prosecute on behalf of the Debtors' Estates. The Plan—which seeks to release these claims for no value—may not be confirmed because (i) per this Court's order, these Avoidance Actions belong to unsecured creditors and (ii) in any event, the ABL Lenders have not provided any value on account of the avoidable preference.

- <u>Third</u>, the proposed GUC Trust Waterfall violates this Court's order that "the avoidance actions belong to the Unsecured Creditors" because the Debtors attempt to place themselves at the front of the line for GUC Trust Proceeds for reimbursement of certain Administrative Claims. Moreover, the Term Lenders and ABL Lenders—who chose the chapter 11 process as a means to foreclose upon their collateral—have been ordered by this Court to "pay for the cost of [the chapter 11] process," which includes payment of Administrative Claims. The Term Lenders and ABL Lenders may not now offload these obligations onto unsecured creditors.

- <u>Fourth</u>, as of this writing the Debtors have selectively negotiated numerous settlements with certain purported "critical vendors," with certain smaller creditors being offered full payment and other larger creditors being offered average settlements of approximately ███████████████. But this Court's Final Critical Vendors Order limited the Debtors' critical vendor payments to those "necessary to avoid irreparable harm." The Debtors preferential treatment of these similarly situated unsecured creditors—particularly when juxtaposed with the *de minimis* recovery the Plan provides to non-preferred unsecured creditors—constitutes unfair discrimination under Section 1129(b)(1) of the Bankruptcy Code.

- <u>Fifth</u>, because the Plan was authored in effect by the Term Lenders to deliver excess value to themselves at the expense of general unsecured creditors, the Plan is not proposed in "good faith" under Section 1129(a)(3) of the Bankruptcy Code. Furthermore, the deal in principle was reached before any valuation analysis was conducted and, by the time the Lazard Valuation was provided, it was too late to reset the status quo. The retrofitted Lazard Valuation is obviously intended to cleanse the Board's breach of its duty of care in executing the PSA and Plan without any conception of the value it was giving away to the Term Lenders.

11.     For all of these reasons, and as discussed more fully below, the Court should deny confirmation of the Plan.

# BACKGROUND

## I.    General Case Background.

12.    On June 9, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (Walrath, J.) (the "Bankruptcy Court").[3]

13.    On June 19, 2015, the United States Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [D.I. 88], appointing the Committee to represent the interests of the Debtors' unsecured creditors.

14.    On the same day, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume Plan Support Agreement* [D.I. 98] (the "PSA Motion"). Attached thereto as Exhibit B was that certain Plan Support Agreement dated as of June 8, 2015 (the "PSA"), by and among the Debtors, the Consenting Lenders, the Consenting Equity Holders, and the other parties thereto (the "Plan Support Parties").[4]

15.    On July 21, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Approving the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballots and Notices in Connection Therewith, (D) Establishing the Plan Confirmation Schedule, and (E) Granting Related Relief* [Docket No. 278] (the "Disclosure Statement Approval Motion").[5]

---

[3] The facts and circumstances culminating in these Chapter 11 Cases are more fully set forth in the *Declaration of Kevin Nystrom, Chief Restructuring Officer, Interim Chief Executive Officer, and President of Boomerang Tube, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 2] (the "First Day Declaration").

[4] Attached as Exhibit A to the PSA is the Plan Term Sheet.

[5] On July 24, 2015, the Court entered its (i) *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507: (A) Authorizing the Debtors to Obtain Post-Petition Term Loan Financing; (B) Granting Liens and Providing Superpriority Administrative Expense Status; (C) Granting Adequate Protection; (D) Modifying Automatic Stay; and (E) Granting Related Relief* [Docket No. 291] (the "Final Term DIP Order"); and (ii) *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Revolving Loan Financing Pursuant to 11 U.S.C. §§ 105, 361,*

16.     On August 13, 2015, the Debtors filed their *Disclosure Statement for Debtors'*
*Amended Joint Prearranged Chapter 11 Plan Dated August 13, 2015* [Docket No. 378] (the
"Disclosure Statement").

17.     On August 14, 2015, the Court entered its *Order (A) Approving the Disclosure*
*Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballots and*
*Notices in Connection Therewith, (D) Establishing the Plan Confirmation Schedule, and (E)*
*Granting Related Relief* [Docket No. 384].

18.     On September 4, 2015, the Debtors filed a further-amended version of the
*Debtors' Amended Joint Prearranged Chapter 11 Plan* [Docket No. 470] (the "Plan").

19.     A hearing to consider confirmation of the Plan (the "Confirmation Hearing") has
been scheduled for September 21, 2015.

## II.     Debt Structure.

20.     As of the Petition Date, the Debtors had funded debt obligations of approximately
$253.6 million, comprised primarily of indebtedness of approximately $33.0 million under the
ABL Facility[6], $214.0 million under the Term Loan Facility[7], and $6.6 million under the Bridge
Loan Facility.

21.     Pursuant to the Final DIP Orders, on July 24, 2015, the Court approved a $145.0
million DIP Financing package comprised of two separate facilities: (i) a $60.0 million "new
money" Term DIP Facility secured by priming, first-priority security interests in and liens on all
Term Collateral; and (ii) an $85.0 million ABL DIP Facility secured by first-priority security

---

*362, 363(c), 363(e), 364(c), and 364(e) and (B) Use Cash Collateral, (II) Granting Adequate Protection to the*
*Prepetition Revolving Loan Lenders, and (III) Granting Related Relief* [Docket No. 293] (the "Final ABL DIP
Order," and together with the Final Term DIP Order, the "Final DIP Orders").

[6] The lenders under the ABL Facility are referenced herein as the "ABL Lenders."

[7] The lenders under the Term Loan Facility are referenced herein as the "Term Lenders."

interests in and liens on all ABL Collateral.[8]  In the aggregate, the DIP Financing provides approximately $60.0 million of available liquidity, as the Debtors' ABL Facility is "rolled-up" into the ABL DIP Facility and the Bridge Loan Facility was paid off with proceeds of the Term DIP Facility.  On the Effective Date, the Term DIP Facility is converted into a $60.0 million senior secured Exit Term Facility, and the ABL DIP Facility is converted into a $75.0 million Exit ABL Facility.  The Debtors will also issue $55.0 million of Subordinated Notes on the Effective Date on account of Class 4 Term Loan Facility Claims (as described below).

22.    Accordingly, as of an assumed effective date for the Plan of September 30, 2015 (the "Effective Date"), the Debtors' valuation hurdle to achieve recovery to unsecured creditors will equal approximately $302.9 million (this amount, the "Funded Debt Hurdle").[9]

### III.    The Plan.

23.    The Plan is consistent in all material respects with, and indeed seeks to implement, the PSA.

### i.    Treatment of Claims and Interests.

24.    Consistent with the PSA, the Plan reduces the Debtors' funded debt obligations by converting approximately $214.0 million in outstanding principal of Class 4 Term Loan Facility Claims into (i) 100% of the New Holdco Common Stock[10] and (ii) $55.0 million of

---

[8] See Final Term DIP Order ¶4.

[9] The Funded Debt Hurdle is comprised of: (i) $28.0 million under the DIP ABL Facility; (ii) $214.7 million under the Prepetition Term Loan; (iii) Term Loan accrued interest of $7.4 million; (iv) $60.0 million under the Term Loan DIP; (v) $4.1 million on account of certain Leases; and (vi) a downward adjustment on account of Excess Cash of $11.4 million.

[10] Subject to dilution for (1) the payment of the Exit Term Facility Backstop Fee and the Exit Term Facility Closing Fee in the aggregate equal to collectively 20% of the New Holdco Common Stock as of the closing date of the Exit Term Facility and (2) issuances of equity under a management incentive plan not to exceed 5% of the total outstanding equity of New Holdco.

Subordinated Notes issued by New Opco.  The Plan provides that New Holdco will hold 100% of the New Opco Common Units.

25.     Holders of Class 6 Allowed General Unsecured Claims will receive their pro rata share of the GUC Trust Proceeds in accordance with the GUC Trust Waterfall (as described more fully below).  Holders of Allowed DIP ABL Facility Claims will receive their pro rata share of interests in the Exit ABL Facility Loans.  Holders of Allowed DIP Term Facility Claims will receive payment in full in Cash, and holders of Class 3 Allowed ABL Facility Claims will receive their pro rata share of interests in the Exit ABL Facility Loans.  Each holder of an Allowed Class 5 SBI Secured Claim will receive a promissory note issued by New Opco in favor of such holder (each, an "SBI Secured Note").

26.     Under the Plan, Class 7 Intercompany Claims and Class 8 Intercompany Interests will be left unaltered.  All existing Equity Securities in Classes 9, 10, and 11 will be cancelled. Holders of Class 1 Other Secured Claims and Class 2 Other Priority Claims will be reinstated or paid in full in Cash.

**ii.     Establishment of GUC Trust.**

27.     The Plan provides for the establishment of a general unsecured claims trust (the "GUC Trust"), which is to be seeded by the Reorganized Debtors with $25,000 of initial funding (the "GUC Trust Initial Funding Amount") and function as a vehicle to distribute potential value accruing from the Debtors' Avoidance Actions (such actions, collectively, the "GUC Trust Assets," and the Cash proceeds from liquidation thereof, the "GUC Trust Proceeds") to holders of Allowed General Unsecured Claims (the "GUC Trust Beneficiaries").

28.     Under the Plan, the GUC Trust Proceeds are to be paid as follows (the "GUC Trust Waterfall"): (i) first, to repay in full the GUC Trust Initial Funding Amount to the

Reorganized Debtors; (ii) <u>second</u>, to reimburse the Reorganized Debtors for any Allowed Professional Claim amounts paid that exceed the amounts authorized under the DIP Budget; (iii) <u>third</u>, to pay or establish reserves for payment of GUC Trust administrative costs; and, if any funds remain; (iv) <u>fourth</u>, to make distributions to holders of Allowed General Unsecured Claims. <u>See</u> Plan §1.1.95.

**IV.    Debtors' Prepetition Marketing Process And Committee's Postpetition Sale Efforts**.

29.    The Debtors retained Lazard Freres & Co. LLC ("<u>Lazard</u>") as their investment banker on May 4, 2015.[11]  Lazard was retained to, among other things, "assist[] the Debtors in identifying and evaluating candidates for any potential Sale Transaction" and launch a "prepetition marketing process of the Company."  Lazard Retention Motion at ¶¶ 11(a), 12. Beginning on May 5, 2015, Lazard prepared certain marketing materials, including a five-page "teaser," or summary of the Company's operations.  On May 7, 2015, Lazard commenced the sale process by contacting a limited universe of potential buyers, who would then have until June 1, 2015 to execute confidentiality agreements, perform due diligence, and submit non-binding indications of interest.

30.    Ultimately, three parties submitted indications of interest by the June 1st deadline. However, the prepetition marketing process was terminated on June 3, 2015, when the Company "directed Lazard to discontinue efforts to market and consummate a Sale Transaction." Lazard Retention Motion at ¶15.  Accordingly, the prepetition sale process lasted a total of twenty-seven (27) days—and was truncated before interested parties could access or review a data room.

---

[11] <u>See</u> *Debtors' Application for an Order (I) Authorizing the Retention and Employment of Lazard Freres & Co. LLC as Investment Banker to the Debtors, Nunc Pro Tunc to the Petition Date, and (II) Waiving Certain Information Requirements of Local Rule 2016*-2 [Docket No. 101] (the "<u>Lazard Retention Motion</u>").

31.    Since its formation, the Committee and its advisors have been soliciting interest for potential purchasers or investors for the Company.  At the DIP Hearing, the Court freed the Debtors from the PSA's limitation on their ability to consider incoming inquiries from potential investors.  Alvarez & Marsal ("A&M"), the Committee's financial advisor, referred several interested parties to the Debtors who executed non-disclosure agreements and commenced diligence on the Company.  All of this progress has occurred with limited Debtor involvement (and only after being directed to do so by the Court).  Ultimately, however, on account of the truncated sale process and condensed postpetition case milestones, none of these interested parties made a proposal.

## V.    **Lazard Valuation**.

32.    On September 2, 2015, Lazard provided the Committee and its advisors with a final valuation report (the "Lazard Valuation").[12]  In sum, the Lazard Valuation estimates that the consolidated TEV for Reorganized Boomerang is in a range between $200.0 million and $220.0 million, with a midpoint of $210.0 million, as of an assumed Effective Date of September 30, 2015.[13]

33.    Lazard considered three generally accepted valuation methodologies to arrive at its estimate of Reorganized Boomerang's TEV: (i) discounted cash flow analysis ("DCF"); (ii) comparable company analysis; and (iii) precedent transaction analysis:[14]

- **DCF Analysis**: For its DCF analysis, Lazard valued the Company based on its projected unlevered free cash flows on a fully-taxed basis.  The projected unlevered

---

[12] The Lazard Valuation is attached hereto as **Exhibit A**.  The Committee received a draft valuation report from Lazard on or about August 10, 2015.

[13] See Lazard Valuation at 6.

[14] Id. at 5.  However, on account of "the lack of comparable precedent transactions," Lazard did not rely on precedent transaction analysis in formulating its final opinion.  Id. at 6.  Accordingly, the conclusions contained in the Lazard Valuation are based entirely on Lazard's DCF and comparable company analyses.

free cash flows in the DCF analysis are derived from management's Long Range Projections ("LRP") as of July 2015 for the period from October 2015 through December 2018, inclusive (the "Projection Period"). The future unlevered free cash flows are then discounted by the Company's risk-adjusted weighted average cost of capital ("WACC") to derive a present value of such cash flows. Lazard calculated a WACC for Reorganized Boomerang of approximately 12.0%-14.0%, based on comparable capital structure statistics of a set of eight downhole consumable industry peers that manufacture materials that are used in the drilling and completion of wells (the "Downhole Peers") and Lazard's qualitative assessment of the Company and the industry in which it operates. There are two key drivers of Lazard's WACC calculation: (i) the "beta," a statistical term that seeks to measure the volatility, or risk, of a company's equity as compared to the broader market; and (ii) the "market risk premium," which seeks to capture the additional return a prudent investor will require the target company to generate in excess of the risk-free rate of return. Lazard used a predicted Barra beta of 1.42 and a market risk premium of 7.0% to arrive at its ultimate WACC conclusion.

The present value of all cash flows after the Projection Period is calculated using the perpetuity growth methodology; Lazard assumed that Reorganized Boomerang's free cash flow grows at a constant rate of 2.5%-3.5% after FY2018E, the terminal year. Altogether, based on its DCF analysis Lazard values Reorganized Boomerang in a range between $155.0 million and $215.0 million.

- **Comparable Companies Analysis**: Lazard identified two groups of peer companies with characteristics it deems relevant to valuing Reorganized Boomerang: (i) the aforementioned Downhole Peers; and (ii) public steel producers with OCTG production capacity (the "Steel Peers"). Lazard then considered a number of financial multiples and ratios to determine the appropriate valuation metric(s) to apply to Reorganized Boomerang; ultimately, Lazard selected TEV as a multiple of adjusted EBITDA as the most relevant metric. Lazard based its analysis on forward earnings estimates for the calendar years ending 2016 and 2017 as well as "cycle" EBITDA earnings generated over the period from 2012 through 2017E. Lazard then applied peer EBITDA multiples to Reorganized Boomerang's comparable financial metrics based upon: (i) projected FY2016E adjusted EBITDA; (ii) projected FY2017E adjusted EBITDA; and (iii) "cycle" EBITDA based on six-year average FY12A-FY17E adjusted EBITDA.

  Ultimately, Lazard afforded its comparable companies analysis "some weight" and determined that on a comparable companies basis, Reorganized Boomerang is valued in a range between $170.0 million and $270.0 million (based on Downhole Peers' multiples).

34.  Lazard's ultimate conclusion that Reorganized Boomerang's TEV is between

$200.0 million and $220.0 million is "based substantially on the results of the DCF analysis, with

some weight also given to the results of the Comparable Company analysis."[15]  In reaching its conclusion, Lazard "did not apply a formulaic calculation to incorporate these three methodologies, but rather incorporated elements of judgment and interpretation to arrive at its conclusion."[16]

## VI. **A&M Valuation**.

35.    On September 10, 2015, A&M completed its analysis of Reorganized Boomerang's TEV, also assuming an Effective Date of September 30, 2015 (the "A&M Valuation").[17]  A&M considered the same three generally accepted valuation methodologies— DCF, comparable companies, and precedent transactions—as those considered by Lazard.  In sum, A&M computes a TEV for Reorganized Boomerang in a range between $312.0 million and $361.0 million, with a midpoint of $335.0 million.[18]  As with Lazard, A&M's valuation conclusion is based primarily on the results of its DCF analysis:

- **DCF Analysis**: For consistency, in its DCF analysis A&M also utilized management's LRP for the same Projection Period.[19]  However, and as explained further below, A&M made several assumptions that differ from those underlying Lazard's DCF.  First, A&M calculated a WACC for Reorganized Boomerang of 9.73% and applied a WACC range of 9.5%-10.0% in its analysis.[20]  Unlike Lazard, A&M used a historical unlevered beta of 0.80 (as opposed to the Barra predicted beta used by Lazard) and a market risk premium of 6.0% to arrive at its ultimate WACC computation.

---

[15] Id. at 38.

[16] Id. at 5.

[17] The A&M Valuation is attached hereto as **Exhibit B**.

[18] See A&M Valuation at 7.

[19] Id. at 27.

[20] Id. at 32.

Second, A&M incorporated into management's LRP certain cost savings identified by management that are accretive to EBITDA. These cost savings have a present value of $21.0 million and are then added back as part of the TEV calculation.[21]

Third, A&M adjusted the depreciation figures from the LRP by removing the hypothetical "fresh start accounting" write-down of PP&E of approximately $57.0 million. This adjustment increases depreciation by $4.0 million per year. The present value of the tax shield created by the removal of the PP&E write-down is approximately $18.0 million.[22]

- **Comparable Companies Analysis**: A&M selected a set of five publicly traded companies in the OCTG industry that, like Boomerang, derive a majority (80%-plus) of their revenue from the sale of steel pipe and tubular goods.[23] In particular, A&M included two companies in its analysis—Vallourec SA and Tenaris S.A.—that were deemed the most comparable to Boomerang.

- **Comparable Transactions Analysis**: A&M selected 6 precedent merger and acquisition transactions involving the sale of OCTG companies similar to Boomerang. Although A&M did not rely on this methodology (as Boomerang's recent financial performance is not indicative of a normalized earnings level), the comparable transactions were used to support the exit multiple utilized in A&M's DCF analysis. A&M concluded on the basis of this analysis that similar OCTG companies have been sold in the past for between 7.0x and 8.0x adjusted EBITDA.

36.    Appendix C of the A&M Valuation contains a detailed critique of certain aspects of the Lazard Valuation. As discussed more fully therein and in relevant part below, the Lazard Valuation contains fundamental flaws and internal inconsistencies that lead to an unsupportable TEV conclusion for Reorganized Boomerang.

## ARGUMENT

37.    Plan proponents bear the burden of proving to the Court that a proposed plan satisfies every applicable confirmation requirement under Bankruptcy Code Sections 1129(a) and (b). See In re Exide Techs., 303 B.R. 48, 58 (Bankr. D. Del. 2003); In re Quigley Co., Inc., 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010). This burden is a heavy one, and requires careful

---

[21] Id. at 9, 48.

[22] Id. at 30.

[23] Id. at 38.

consideration of each of the relevant inquiries articulated by Bankruptcy Code Section 1129. See In re Vita Corp., 380 B.R. 525, 528 (C.D. Ill. 2008); In re Sacred Heart Hosp. of Norristown, 182 B.R. 413, 423 (Bankr. E.D. Pa. 1995). This is especially so where, as here, a debtor acts as the plan proponent. See, e.g., Everett v. Perez (In re Perez), 30 F.3d 1209, 1214 n.5 (9th Cir. 1994) ("The burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary relationship to the estate's creditors.").

38.    In a case such as this one, in which an impaired class (Class 6) has rejected the Plan, "the plan proponent must also show that the plan meets the additional requirements of §1129(b), including the requirements that the plan does not unfairly discriminate against dissenting classes and the treatment of dissenting classes is fair and equitable." See In re Exide Techs., 303 B.R. at 58; In re Genesis Health Ventures, Inc., 266 B.R. 591, 599 (Bankr. D. Del. 2001) ("A nonconsensual plan requires the proponent to prove all but one of the thirteen elements [of Bankruptcy Code Section 1129(a)], that all classes consent or are unimpaired, 11 U.S.C. §1129(a)(8), plus the additional requirements of section 1129(b), that the plan does not unfairly discriminate against dissenting classes and that treatment of such dissenting classes is fair and equitable."); Matter of Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 221 (Bankr. D.N.J. 2000).

39.    As discussed more fully below, the Debtors cannot satisfy these burdens. Accordingly, the Court should not approve the Plan.

I.     **THE PLAN SHOULD NOT BE CONFIRMED BECAUSE ITS ALLOCATION OF UNSECURED CREDITOR VALUE TO THE TERM LENDERS IS NOT FAIR AND EQUITABLE.**

40.     Class 6 General Unsecured Claims have voted to reject the Plan.  In a non-consensual case such as this one, Bankruptcy Code §1129(b)(1) provides that if all confirmation requirements of §1129(a) other than §1129(a)(8) are met, the court "shall confirm the plan notwithstanding…if the plan does not discriminate unfairly, and is fair and equitable" with respect to each non-accepting, impaired class of claims.  11 U.S.C. §1129(b)(1).  Section 1129(b)(2)(B), in turn, describes how a plan may be "fair and equitable" to a class of impaired, non-accepting general unsecured claims.  11 U.S.C. §1129(b)(2)(B).  The "fair and equitable" standard "can be seen to have at least two key components: the absolute priority rule; and the rule that no creditor be paid more than it is owed."  7 <u>Collier on Bankruptcy</u> ¶1129.03[4][a].

41.     The second foundational component of the "fair and equitable" requirement—that no creditor may be paid more than it is owed—may be briefly summarized: "[o]nce the participant receives or retains property equal to its claim, it may receive no more."  7 <u>Collier on Bankruptcy</u> ¶1129.03[4][a][ii].  Put differently, no claim or interest holder may be paid a "premium" in excess of the allowed amount of its claim.  <u>Id.</u>  For this reason, a plan that proposes to pay senior creditors value in excess of their allowed claim amounts is not "fair and equitable" under Section 1129(b)(2)(B) of the Bankruptcy Code, and may not be confirmed.  <u>See</u> <u>In re Penn Cent. Transp. Co.</u>, 596 F.2d 1102, 1110 (3d Cir. 1979) ("[A] plan is not 'fair and equitable' unless it provides participation for claims and interests in complete recognition of their strict priorities, and unless the value of the debtor's assets supports the extent of the participation afforded each class of claims or interests included in the plan."); <u>In re Granite Broad. Corp.</u>, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (citing <u>New England Coal & Coke Co.</u>

v. Rutland Co., 143 F.2d 179, 186 (2d Cir. 1944)) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated the junior classes of debt or equity, as the case may be."); In re Exide Techs., 303 B.R. 48 at 61 (denying confirmation of plan that afforded secured lenders value in excess of the amount of their claims); In re Genesis Health Ventures, Inc., 266 B.R. at 612 ("A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims."); In re MCorp Fin., Inc., 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) ("[A] dissenting class should be assured that no senior class receives more than 100 percent of the amount of its claims…The safeguards that no claim or interest receive more than 100 percent of the allowed amount of such claim…will insure that the plan is fair and equitable").

42.     As Plan proponent, it is the Debtors' burden to prove to this Court that the Plan does not afford any Class value in excess of the amount of its claim.  See, e.g., In re Armstrong World Indus., 348 B.R. 111, 120 & n. 14 (D. Del. 2006) (plan proponent must establish by preponderance of the evidence the satisfaction of requirements of both Bankruptcy Code Section 1129(a) and 1129(b)); 7 Collier on Bankruptcy ¶ 1129.02[4] ("If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of section 1129(b) are also met.  In either situation, the plan proponent bears the burden of proof by a preponderance of the evidence.").

43.     In these Cases, the Reorganized Debtors' TEV directly impacts whether the Plan's treatment of unsecured creditors is fair and equitable.  See In re Exide Techs., 303 B.R. at 60-61 ("[a] determination of [a] Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. §1129(b)."); In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) ("A valuation of the debtor's business is, by

18

virtue of the statutory language, almost a prerequisite to a determination that a plan satisfies the fair and equitable test of §1129(b).").

44.     As discussed more fully below, the Debtors cannot carry their burden of proof.  In effect, the Plan transfers 100% of the equity value of the Reorganized Debtors—an enterprise worth upwards of $361.0 million—to the Term Lenders, notwithstanding that their claims have an allowed value of only $214.0 million.  In so doing, the Plan overcompensates the Term Lenders and deprives unsecured creditors of their rightful allocation of estate value.  Such treatment is antithetical to the Bankruptcy Code's "fair and equitable" requirement.  The Plan therefore cannot be confirmed.

**A.     By Providing Value To The Term Lenders In Excess Of The Value Of Their Claims, The Plan Violates The Absolute Priority Rule.**

45.     The starting points for the conclusion that the Plan violates the absolute priority rule are the flawed assumptions that underlie the Lazard Valuation.  As described more particularly below, Lazard made three material errors in its analysis that cause their conclusions of value to be artificially depressed.  The A&M Valuation, which remedies the Lazard Valuation's flaws, demonstrates that the Reorganized Debtors' TEV exceeds the Funded Debt Hurdle, thereby creating surplus value that must be distributed to unsecured creditors.

**i.     The Lazard Valuation suffers from several material defects that make its conclusions of value unreliable.**

46.     The Supreme Court has held that an accurate valuation of a reorganized debtor must be based upon the debtor's future earning capacity.  Consol. Rock Prods. Co. v. Du Bois, 312 U.S. 510, 526 (1941) ("The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable."); Protective Comm. v.

Anderson, 390 U.S. 414, 442 n.20 (1968) (describing reorganization value as the "present worth of future anticipated earnings").  For this reason, DCF analysis, the bedrock of any reliable corporate valuation exercise, "has been described as a forward-looking method that measure[s] value by forecasting a firms' ability to generate cash."  See In re Exide Techs., 303 B.R. at 63; See also In re Jartran, Inc., 44 B.R. 331, 368 (Bankr. N.D. Ill. 1984) ("In arriving at a value . . . an estimate must be made of the present value of future earnings.  The discounted cash flow approach . . . achieves this objective.").

47.    The Lazard Valuation suffers from three principle defects, all of which are interrelated and combine to result in an artificially depressed TEV for the Reorganized Debtors.[24]  First, Lazard selected an inaccurate set of comparable companies.  Simply put, the Downhole Peers are fundamentally dissimilar to Boomerang because they do not manufacture OCTG pipe.  This distinction is critical because Lazard uses its set of Downhole Peers to derive a median unlevered beta of 1.42, which is a main driver of its WACC computation.  Second, Lazard relies on Barra predictive betas instead of historical betas.  This is problematic because Barra betas are based on a subscription-only, "black-box" proprietary forecasting model that cannot be reverse-engineered; indeed, Lazard's valuation professional, Tim Pohl, had admitted that he and other Lazard professionals are unaware as to how Barra computes its betas.  By contrast, historical betas are calculable and thus precise.  Then-Vice Chancellor Strine expressly rejected reliance on Barra betas for these reasons in Global GT v. Golden Telecom, Inc., 993 A.2d 497, 518-522 (Del. Ch. 2010), aff'd 11 A.3d 214 (Del. 2010).  Third, Lazard's comparable companies analysis is skewed downward because Lazard relies on a "cycle" EBITDA multiple based on Boomerang's average results for a six year period from 2012-2017.  This approach is

---

[24] The fundamental flaws contained in the Lazard Valuation are discussed at length in Appendix C to the A&M Valuation.

flawed because Lazard's "cycle" EBITDA for Boomerang (of $26.0 million) bakes in

Boomerang's 2015 EBITDA of *negative $35.0 million*.  As such, the "cycle" EBITDA metric

does not accurately reflect Boomerang's normalized, or "steady state," earnings (which A&M

estimates is closer to $38.0 million).  By applying TEV/EBITDA multiples to an inordinately

low "cycle" EBITDA figure, Lazard artificially depresses the TEV of Reorganized Boomerang.

Collectively, the flaws contained in the Lazard Valuation cause Lazard to understate

Reorganized Boomerang's TEV by between $112.0-$141.0 million, as discussed more fully

below.

> **a.  The Downhole Peers "comparable" companies selected by Lazard are fundamentally different from Boomerang.**

48.     Lazard's use of incomparable Downhole Peers companies to infer a median

unlevered beta of 1.42 causes their WACC calculation to be disproportionately high and,

consequently, their conclusions of value to be improperly depressed.[25]  Not one of the eight

Downhole Peers identified by Lazard focuses on OCTG manufacturing.  For instance, three of

the Downhole Peers identified by Lazard—CARBO Ceramics, Fairmount Santrol Holdings, and

U.S. Silica Holdings—produce oil and gas proppants, such as sand or ceramic sand, not OCTG

pipe.  Similarly, two other companies Lazard claims are comparable to Boomerang—Flotek

Industries and Newpark Resources—are primarily chemical producers.  The remaining

Downhole Peers are tool manufacturers (i.e., drill bits and the like).  As Lazard notes in their

report, Boomerang is a "pure-play OCTG pipe manufacturer."[26]  Accordingly, the Downhole

---

[25] See Lazard Valuation at 22.

[26] Id. at 28.

Peers are fundamentally dissimilar to Boomerang.[27]  It is axiomatic that "[s]electing the right peer group is critical to coming up with a reasonable valuation using multiples."[28]

49.    Furthermore, Lazard's Downhole Peers omit the two companies—Tenaris and Vallourec—that the Company's own management in 2012 identified as being most comparable to Boomerang's business model.[29]  As explained in the A&M Valuation, Tenaris and Vallourec are two of the largest global suppliers of OCTG and derive substantially all of their revenue from steel tubular goods for the oil and gas end markets; their largest market is North America.  This makes them nearly identical to Boomerang.  Lazard's failure to consider Tenaris and Vallourec in their comparable companies analysis undercuts the reliability of their valuation conclusions and artificially deflates the Debtors' TEV.

50.    The flawed set of comparable companies relied upon by Lazard is important because Lazard used the Downhole Peers to infer a median unlevered beta for Boomerang of 1.42.[30]  Had Lazard selected a more representative group of comparable companies upon which to compute beta, it would have found that OCTG companies (including Tenaris and Vallourec) have a much lower median unlevered beta of 0.80.[31]  This distinction is not merely academic.  As set forth in the A&M Valuation, by replacing Lazard's unlevered beta of 1.42 with a more

---

[27] For a detailed discussion of why the Downhole Peers are fundamentally different than Boomerang, see page 59 of the A&M Valuation.

[28] Tim Koller, Marc Goedhart, & David Wessels, VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 345 (6th ed. 2015).

[29] See November 29, 2012 Board Meeting Minutes (Debtors0005062) at Bates No. Debtors005131 ("Tenaris and Vallourec are likely to be seen as the closest comparables.").

[30] See Lazard Valuation at 22.

[31] See A&M Valuation at 32, 62.

industry-representative beta of 0.80 ***and keeping all other factors constant***, Reorganized

Boomerang's TEV increases by ***approximately $119.0 million***.[32]

> ### b. Lazard's reliance on Barra predicted betas is improper and artificially depresses Reorganized Boomerang's TEV.

51.     Second, Lazard's use of Barra betas, as opposed to historical betas, is flawed.[33]

As set forth in the A&M Valuation, Barra betas are materially higher compared to historical

betas, and no one knows why.[34]  For instance, the Downhole Peers identified by Lazard have a

median levered Barra beta of 1.70 but a median levered historical beta of only 1.47, a 13.5%

difference.  Moreover, Tenaris and Vallourec—the two companies deemed most comparable to

Boomerang by the Company's investment banker in 2012—have levered Barra betas of 1.62 and

1.79, respectively, but levered historical betas of only 1.04 and 1.33, a 35.8% and 25.7%

difference, respectively.  As discussed more fully in the A&M Valuation, these discrepancies

have an enormous impact on valuation: even a small difference in beta can move the valuation

needle by tens of millions of dollars.

52.     Due to the proprietary formula used by Barra to derive Barra betas, historical

betas are considered more reliable for purposes of WACC calculation.  Indeed, leading treatises

relied upon by industry professionals state that historical betas should be used for the valuation

of private firms.[35]  For this reason, the Delaware Chancery Court rejected the use of Barra betas

---

[32] Id. at 62.

[33] To compute the median levered betas for Downhole Peers, Lazard relied on predicted Barra betas as of June 30, 2015.  See Lazard Valuation at 22.

[34] See A&M Valuation at 61.

[35] See Aswath Damodaran, INVESTMENT VALUATION: TOOLS AND TECHNIQUES FOR DETERMINING THE VALUE OF ANY ASSET 668-669 (3d ed. 2012) ("The beta in the capital asset pricing model (CAPM) and betas (in the multifactor models) that measure this risk are usually estimated using historical stock prices . . . The standard

in Global GT LP v. Golden Telecom, Inc., 993 A.2d 497, 521 (Del. Ch. 2010) (finding that "the Barra beta's reliability is not buttressed by the weight of any reliable academic or professional literature" and instead relying on the "more common" practice of using a historical beta for valuation purposes); see also In the Matter of Petition of Worldcom Inc. et al., 18 FCC Reg. 17722, 2003 WL 22038242, at *24-25 & n. 275 (Aug. 29, 2003) ("BARRA is not nearly as well known or widely circulated . . . and it is unlikely to have nearly as much influence on the expectations of investors . . . Accordingly, we will not rely on the BARRA betas proposed by AT&T/Worldcom in this case.").

53.     As explained in more detail in the A&M Valuation, an analysis of a representative set of five OCTG producers similar to Boomerang reveals a median unlevered beta of 0.80.[36]  As stated above, inserting this one adjustment into Lazard's DCF analysis expands Reorganized Boomerang's TEV by approximately $119.0 million.[37]

### c.  Lazard's application of a "cycle" EBITDA multiple is also flawed and causes the Lazard Valuation to understate Reorganized Boomerang's TEV.

54.     In its comparable companies analysis, Lazard computed a "cycle" EBITDA for Boomerang based upon a six-year average of the Company's actual and projected adjusted EBITDA for the years 2012-2017.[38]  Lazard notes that adjusted EBITDA "is meant to exclude unusual and nonrecurring items, which is consistent with Wall Street consensus forecasts." Lazard computed a "cycle" EBITDA for Boomerang of $26.0 million and then applied

---

process of estimating the beta in the capital asset pricing model involves running a regression of stock returns against market returns.").

[36] See A&M Valuation at 32.

[37] Id. at 62.

[38] See Lazard Valuation at 29.

TEV/EBITDA multiples of between 6.5x and 8.5x to this figure to compute a relative valuation for Reorganized Boomerang of between \$170.0 million and \$220.0 million.[39]

55.    Lazard's use of "cycle" EBITDA is inappropriate for two reasons.  First, Lazard fails to justify why the six-year period from 2012-2017 fully captures a full cycle within the OCTG industry.  Indeed, the Debtors' CRO has stated that the Company does not expect to OCTG market to return to a "normal" operating environment until 2018.[40]  Second, Lazard's cycle EBITDA of \$26.0 million is artificially depressed because it is skewed by the Company's negative \$35.0 million of EBITDA for 2015 (which correlates to an EBITDA margin of negative 19.0%).  But Boomerang's 2015 results occurred in the context of a cataclysmic collapse in the global oil market; as such, Boomerang's 2015 EBITDA should be deemed an aberration and omitted for purposes of applying a valuation multiple.[41]  They should also not be factored into Lazard's computation of Reorganized Boomerang's terminal value.[42]  Stripping out Boomerang's 2015 EBITDA from the analysis results in a steady state cycle EBITDA for Reorganized Boomerang of \$38.0 million.[43]  As explained more fully in the A&M Valuation, had Lazard properly omitted the Company's 2015 results from its computation of cycle

---

[39] Id. at 39.

[40] See *Final Deposition Transcript of Kevin Nystrom dated August 28, 2015* (the "Nystrom 8.28 Dep. Tr."), at 37:18-22.

[41] See Shannon Pratt, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 275 (5th ed. 2008).  Lazard's cycle EBITDA for Reorganized Boomerang of \$26.0 million implies an EBITDA margin of 6.7% for the same period, which is lower than the Company's historical performance.

[42] See Tim Koller, Marc Goedhart, & David Wessels, VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 710 (6th ed. 2015) ("Make sure the continuing value is based on a normalized level of profits (i.e., a point on the company's long-term cash flow trend line), not a peak or trough.").

[43] See A&M Valuation at 69.

EBITDA, Lazard would have computed an implied TEV for Reorganized Boomerang of

between $250.0 million and $327.0 million.[44]

### d.  Other flaws in Lazard Valuation.

56.     As discussed more fully in the A&M Valuation, the Lazard Valuation suffers

from other flaws that cause its conclusions of value to be artificially depressed:

- **Market Risk Premium**: Lazard utilizes a market risk premium of 7.0% that is
  supported by only one of many widely-available, reputable sources.  Lazard bases its
  7.0% assumption on Ibbotson Associates' Risk Premia Over Time Report.[45]
  However, numerous academic and professional writings suggest the use of a lower
  equity risk premium estimate.  On the basis of this weight of authority, A&M utilized
  a market risk premium of 6.0% in its DCF analysis.  This one percentage point
  discrepancy alone, when incorporated into Lazard's existing DCF analysis, causes
  Reorganized Boomerang's TEV to jump by approximately $25.0 million.[46]

- Failure to rationalize WACC with long-term return on invested capital ("ROIC"):
  Lazard's computed WACC range of 12.0%-14.0% represents a mismatch to the
  ROIC implied by management's LRP.  Simply put, a company's ROIC is "the return
  the company earns on each dollar invested in the business."[47]  In the long run, "a
  company will create value only if its ROIC is greater than its cost of capital."[48]
  Accordingly, a company's ROIC in the long-run should approximate the WACC.[49]
  As discussed at length in the A&M Valuation, the management LRP relied upon by
  both Lazard and A&M equate to a long-term ROIC for Reorganized Boomerang of
  9.8%.[50]  Indeed, A&M's analysis of the eight Downhole Peers identified by Lazard
  demonstrates that these companies' historical ROICs generally exceed their
  WACCs.[51]  And yet, despite all evidence to the contrary, Lazard selected a midpoint

---

[44] Id.

[45] See Lazard Valuation at 23.

[46] See A&M Valuation at 62.

[47] Tim Koller, Marc Goedhart, & David Wessels, VALUATION: MEASURING AND MANAGING THE VALUE OF
COMPANIES 30 (6th ed. 2015).

[48] Id. at 17.

[49] Tim Koller, Marc Goedhart, & David Wessels, VALUATION: MEASURING AND MANAGING THE VALUE OF
COMPANIES 17 (6th ed. 2015).

[50] A&M Valuation at 64.

[51] Id. at 66.

WACC for Reorganized Boomerang of 13.0%—a cost of capital **thirty percent greater** than Company management's projected ROIC.  In effect, by assuming that Reorganized Boomerang's midpoint WACC of 13.0% will exceed management's projected ROIC by over three percentage points, Lazard is stating that the Company will exhibit negative growth after the terminal year.  This is illogical and inconsistent with Lazard's stated assumption that the Company will grow at a perpetuity growth rate of 2.5%-3.5%.[52]

57.     At bottom, each of Lazard's judgment calls appears to be unnecessarily conservative and, whether intended or not, serves to arrive at a depressed valuation of the Reorganized Debtors' TEV that coincidentally justifies the Board's transfer of exorbitant value to the Term Lenders.  For good reason, however, courts are loathe to allow a debtor's financial advisor—who is often motivated to underestimate a debtor's TEV—to make unilateral, subjective adjustments to generally-accepted valuation methods.  See In re Exide Techs., 303 B.R. at 63-65 (rejecting attempts by debtors' investment banker to use inflated 15%-17% discount rate for DCF, in contravention of industry practices, and finding that the banker's "**numerous subjective adjustments to the analysis stray too far** from the generally accepted method of determining the discount rate.") (emphasis added).  Here too, Lazard's efforts to retrofit a depressed valuation of the Reorganized Debtors' TEV "strays too far" from the generally-accepted bounds of corporate valuation.  Accordingly, this Court should find that the conclusions of value contained in the Lazard Valuation are unreliable and do not support the Plan's proposed treatment of unsecured creditors.

> ii.     **The Court should instead rely on the A&M Valuation, which corrects Lazard's errors and demonstrates a midpoint TEV for the Reorganized Debtors of $335.0 million.**

58.     The A&M Valuation corrects the aforementioned defects of the Lazard Valuation.  These corrections result in a TEV for the Reorganized Debtors of between $312.0 million and $361.0 million, with a midpoint of $335.0 million.  At a midpoint TEV of $335.0 million, the

---

[52] See Lazard Valuation at 25.

Reorganized Debtors' TEV exceeds the Funded Debt Hurdle by $32.1 million.   Under the Bankruptcy Code, this value belongs to unsecured creditors.

59.   <u>First</u>, as discussed above, A&M concluded that a lower WACC is appropriate. A&M selected a set of comparable companies that actually produce OCTG pipe.[53]   From this universe of companies, A&M utilized the precise median unlevered historical beta (as opposed to Barra beta) of 0.80 and then re-levered this figure to arrive at a levered beta of 1.13.   A&M also selected a market risk premium of 6.0%, as opposed to the 7.0% used by Lazard, as 6.0% represents the midpoint of the various estimates used by the major sources reporting such metrics (Ibbottson, relied upon by Lazard, is unsurprisingly the highest of the various choices).   After adjusting these two inputs, A&M computed a WACC for Reorganized Boomerang of 9.73% and applied to its DCF analysis a WACC range of between 9.5%-10.0%.   Applying A&M's computed WACC to the exact same cash flow projections utilized by Lazard results in a TEV for the Reorganized Debtors of $298.0 million, an increase of $119.0 million from Lazard's valuation conclusion.[54]

60.   <u>Second</u>, A&M removed the unnecessary $56.6 million "fresh start accounting" write-down of Boomerang's PP&E that is reflected in the Lazard Valuation.   This PP&E write-down is circular because it assumes that Reorganized Boomerang's TEV is in Lazard's computed range of between $200.0 and $220.0 million.   But as demonstrated in the A&M Valuation, Reorganized Boomerang's TEV is substantially greater than Lazard's computed range.   Accordingly, any write-down to PP&E is improper.   Removing this unnecessary PP&E

---

[53] <u>See</u> A&M Valuation at 32.

[54] <u>Id.</u> at 63.

write-down creates a tax shield with a present value of approximately $18.0 million, which must be added back to Reorganized Boomerang's TEV.[55]

61.     Third, A&M incorporated in its TEV calculation the present value of certain cost savings identified by management as either having already been achieved, but not incorporated into the management projections utilized by both experts, or about to be realized.  These cost savings are accretive to EBITDA and were ignored in the Lazard Valuation.  The present value of these cost savings is approximately $21.0 million, which is then appropriately added back to compute Reorganized Boomerang's TEV.[56]

62.     Fourth, A&M adjusted Lazard's "cycle" EBITDA calculation, which is artificially skewed, in part, because it includes Boomerang's non-recurring 2015 results.  Removing Boomerang's 2015 results from the calculation results in a Reorganized Boomerang "steady state" cycle EBITDA closer to $38.0 million.  The adjusted cycle EBITDA of $38.0 million is more reasonably but still only represents an 8.8% EBITDA margin for Reorganized Boomerang, lower than the 3-year average EBITDA margin for the selected public companies which range from 9.8% to 26.5% (median of 14.2%).  Applying Lazard's TEV/EBITDA multiples of 6.5x to 8.5x EBITDA results in a range of implied TEV for Reorganized Boomerang that is closer to A&M's ultimate conclusions of value.

63.     The table below briefly summarizes (i) the assumptions contained in the Lazard Valuation, (ii) the revised assumptions contained in the A&M Valuation, and (iii) the corresponding increase in Reorganized Boomerang's TEV that results from replacing Lazard's assumptions with A&M's revised assumptions:

---

[55] Id. at 30.

[56] Id. at 9.

| Valuation Input | Lazard Metric | A&M Metric | Adjustment to Reorganized Boomerang's TEV |
|---|---|---|---|
| Unlevered beta (component of cost of equity under CAPM) | 1.42 | 0.80 | +$119.0 million |
| Market risk premium (component of cost of equity under CAPM) | 7.0% | 6.0% | +$25.0 million |
| "Cycle" EBITDA (meant to capture long-term, steady-state EBITDA over one full industry cycle) | $26.0 million | $38.0 million | +$80.0 million-$104 million |
| "Fresh start accounting" write-down of PP&E | ($56.6 million) | No write-down necessary | +$18.0 million |
| Present value of future cost savings (accretive to EBITDA) | Not incorporated | Reflects cost savings identified by management | +$21.0 million |
| **Total** | | | **+$112.0 million - $141.0 million** |

64.     The A&M Valuation, prepared in accordance with generally accepted valuation principles, demonstrates that the Reorganized Debtors are worth substantially more than the low-ball valuation thesis presented by the Debtors.  This Court should therefore rely on the A&M Valuation in determining whether the Plan satisfies the Bankruptcy Code's confirmation requirements.  As discussed below, it does not.

        iii.      **The Plan—premised on the flawed Lazard Valuation—violates the absolute priority rule and therefore is not fair and equitable.**

65.     In view of the foregoing, the Plan provides value to the Term Lenders well in excess of their $214.0 million of Allowed Claims.  This lopsided value transfer violates the "absolute priority rule" and therefore renders the Plan not "fair and equitable" under Section 1129(b)(1) of the Bankruptcy Code.

66.     The absolute priority rule, codified at 11 U.S.C. §1129(b)(2)(B)(ii), states in relevant part: "[w]ith respect to a class of unsecured claims…the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ."  11 U.S.C. §1129(b)(2)(B)(ii).  Importantly, courts have determined that "a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims."  See In re Exide Techs., 303 B.R. at 61.  This so-called "rule against premiums on claims" protects the Bankruptcy Code's equitable distribution framework and acts as a safeguard for junior classes of creditors.  See 7 Collier on Bankruptcy ¶ 1129.03[4][a] (citing 124 Cong. Rec. 32,408 (statement of Rep. Edwards)).  As Plan proponents, it is the Debtors' burden to prove to this Court that the Plan complies with the absolute priority rule.  See In re Perez, 30 F.3d at 1214 (proponent bears burdens of proof and persuasion regarding plan's compliance with absolute priority rule).  Here, the Debtors cannot carry these burdens and, as a consequence, confirmation should be denied.

67.     The Plan, in fact, does exactly what the corollary of the absolute priority rule proscribes: it pays a senior class (Class 4 Term Lenders) more than full compensation for its claims.  See In re Exide Techs., 303 B.R. at 61.  In effect, the Plan hands an enterprise (the Reorganized Debtors) with a midpoint TEV of $335.0 million to the Term Lenders on account of their $214.0 million of Allowed Claims.  In other words, the Term Lenders are paid a $32.3 million premium on their Allowed Claims.[57]  In this respect, these Cases are analogous to the cases of In re Exide Technologies, in which this Court denied confirmation of a plan that similarly sought to transfer all of the debtor's reorganized equity to its prepetition lenders.  See 303 B.R. at 80.  In Exide, the debtor's investment banker argued that the debtor's TEV was

---

[57] The excess value provided to the Term Lenders under the Plan equals the difference between (i) the Reorganized Debtors' midpoint TEV of $335.0 million, and (ii) the Funded Debt Hurdle of $302.9 million.

between $950.0 million and $1.050 billion.  Id. at 59.  Because the debtor's funded debt hurdle was $1.285 billion, the debtor argued that its unsecured creditors were out of the money and proposed to hand the lion's share of the company's reorganized equity to its prepetition lenders and secured noteholders.  Id. at 55.  Unsecured creditors were stuck with a *de minimis* cash pool corresponding to a projected recovery of 1.4%.  Id.

68.    However, after identifying several flaws in the debtor's valuation analysis, the creditors' committee argued successfully that the accurate TEV for the company was closer to $1.5 billion - $1.7 billion.  Id. at 66.  This Court agreed with the committee that "the Plan undervalue[d] the Debtor; therefore, there may be sufficient value to pay the Prepetition Lenders' claims in full."  Id. at 77.  Accordingly, the Court found that the plan was not fair and equitable to the debtor's unsecured creditors, and therefore could not be confirmed.  Id. at 80.

69.    The facts of these Cases demand a similar result to that obtained in Exide.  See 303 B.R. at 61.  By lining the pockets of the Term Lenders at the expense of unsecured creditors, the Plan violates the corollary to the absolute priority rule.  See In re Genesis Health Ventures, Inc., 266 B.R. at 612; In re MCorp Fin., Inc., 137 B.R. at 235.  Plan confirmation must therefore be denied.  See In re Exide Techs., 303 B.R. at 61.

## B.    In Any Event, The Retrofitted Lazard Valuation Does Not Cleanse The Board's Derogation Of Its Fiduciary Duty Of Care.

70.    At no point in the Plan negotiation process did the Debtors' Board conduct a valuation of the Debtors' enterprise, as mandated by the Delaware Supreme Court's seminal opinion in Smith v. Van Gorkom, 488 A.2d 858, 874 (Del. 1985) (finding a board grossly negligent by approving a merger transaction without expert advice that the transaction price was fair).  Indeed, the Lazard Valuation was not delivered in final form until September 2, 2015—86 days after the Debtors and Plan Support Parties executed the PSA which memorialized the deal

in principle and 20 days after the filing of this Plan.  By then, of course, the proverbial horse had already left the barn, and there was no turning back.

71.    The Board's ignorance of the Company's valuation while agreeing to a restructuring that transfers substantially all of the Reorganized Debtors' value to the Term Lenders constitutes a breach of the fiduciary duty of care.  It is well-settled that the duty of care requires that directors inform themselves "prior to making a business decision, of all material information reasonably available to them."  Smith v. Van Gorkom, 488 A.2d at 872.  The Delaware Chancery Court provides that "the need for adequate information is central to the enlightened evaluation of a transaction that a board must make."  See In re Rural Metro Corp., 88 A.3d 54, 90 (Del. Ch. 2014).  Accordingly, a Board's failure to adequately "market test" a transaction constitutes a breach of its duty of care.  See Koehler v. NetSpend Holdings, Inc., No. 8373-VCG, 2013 WL 2181518, at *13 (Del. Ch. May 21, 2013) (finding board's failure to engage in pre-agreement market check violated Revlon duties and noting that the Delaware Supreme Court has "counseled that the circumstances in which a market check will not be required are 'limited,' and the reliance on the advice of investment bankers is 'a pale substitute' for a market check."); In re Bidermann Indus. U.S.A. Inc. (In re Bidermann), 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997); In re Loral Space & Commc'ns Inc. Consol. Litig., No. 2808, 2008 WL 4293781, at *23 (Del. Ch. Sept. 19, 2008).  Moreover, under Delaware law, directors have a duty to "exercise appropriate attention" to important corporate decisions.  See In re Caremark Int'l, Inc. Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996).  Indeed, "an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss" may give rise to director liability for ill-advised decisions.  Id.

72.     Here, the Board's decision to cut short their efforts to sell the Company after only twenty-seven days—without the benefit of an enterprise valuation—is a plain breach of the duty of care.  The Debtors—similar to the debtors in <u>Bidermann</u>—never market-tested the transaction, and unlike in <u>Bidermann</u> (where the debtors did not hire an investment banker), here the Debtors did hire Lazard, but abruptly cancelled the sale process after a mere twenty-seven days.  Moreover, as in <u>Rural Metro</u>, the Board did not instruct Lazard to conduct an enterprise valuation of the Company until mid-July, well after the deal-in-principle was inked.[58]  <u>See</u> <u>In re Rural Metro Corp.</u> 88 A.3d at 94-96 (finding board, which "had not received any valuation information until three hours before the meeting to approve the deal," failed to fulfill fiduciary duty of due care).  As Judge Brozman summarized in <u>Bidermann</u>: "[i]t is astounding that the debtors have not . . . test[ed] the market place for other expressions of interest. . . . [that they] have determined to proceed with this offer without knowing what else may be available defies any explanation."  <u>See</u> <u>In re Bidermann Indus. U.S.A. Inc. (In re Bidermann)</u> 203 B.R. at 551.  That the Board executed the PSA and Plan without understanding the Company's valuation similarly defies explanation.  <u>See id.</u>  Not only did the Board give away the store to the Term Lenders, it gave away the store without any knowledge of what was on the shelves.[59]

73.     In sum, the retrofitted Lazard Valuation does not "sprinkle holy water" on the Board's uninformed actions.  <u>See</u> <u>Coram Healthcare</u>, 271 B.R. at 240.  By failing to arm itself

---

[58] <u>See</u> *Final Deposition Transcript of Kevin Nystrom dated July 2, 2015* (the "<u>Nystrom 7.2. Dep. Tr.</u>"), at 110:23.

[59] Moreover, to the extent the Debtors assert the post-facto Lazard Valuation can somehow absolve the Board's breach of due care, they are misinformed.  Commissioning the post hoc Lazard Valuation after the Board had already locked itself into the PSA and Plan does nothing to obviate the breach of fiduciary duty.  <u>See</u> <u>Van Gorkom</u>, 488 A.2d at 874 ("[D]efendants contend that what the directors did and learned subsequent to [in effect binding themselves to the transaction] was properly taken into account…in determining whether the Board's judgment was an informed one.  We disagree with this post hoc approach."); <u>see also</u> <u>Coram Healthcare</u>, 271 B.R. at 240 (hiring of consultant to "sprinkle holy water on the situation" did not cure conflict of interest or evidence good faith); <u>In re Netsmart Techs., Inc. S'holder Litig.</u>, 924 A.2d 171, 197 (Del Ch. 2007) (board may not sanitize uninformed decision to sell company through "inert, implicit post-signing market check.").

with a knowledge of the Company's TEV prior to executing the PSA and Plan, the Board violated its fiduciary duties owed to unsecured creditors. Consequently, the Plan cannot be confirmed.

## II.    THE GUC TRUST WATERFALL IS IMPERMISSIBLE IN THREE RESPECTS AND PRECLUDES CONFIRMATION OF THIS PLAN.

74.    The Debtors propose a "GUC Trust Waterfall" to determine the priority of payment of the GUC Trust Proceeds under the Plan and GUC Trust Agreement.[60] However, notwithstanding that the GUC Trust Beneficiaries are expressly defined under the Plan as only "the holders of Allowed General Unsecured Claims," through the GUC Trust Waterfall the Debtors attempt to place themselves at the front of the line for payment of GUC Trust Proceeds. The Debtors' overreaching renders the Plan unconfirmable, for the reasons that follow.

### A.    The Debtors' Attempt To Recoup Administrative Expenses From The Proceeds Of Avoidance Actions Violates This Court's Order And Otherwise Operates As An Impermissible "Cap" On Administrative Liability.

75.    Before one dollar of GUC Trust Proceeds is distributed to general unsecured creditors, the Debtors demand priority reimbursement of (i) the $25,000 GUC Trust Initial Funding Amount, and (ii) "all Allowed Professional Claim amounts paid by the Debtors or Reorganized Debtors that are in excess of the amounts authorized under the DIP Budget." In other words, the Debtors ask that the sole source of potential value available to pay General Unsecured Claims be siphoned off to reimburse the Debtors' payment of their own Administrative Claims.[61] In addition to rendering the GUC Trust entirely illusory, this proposed

---

[60] See Plan §1.1.96. The Committee has consent rights with respect to the GUC Trust Agreement. As of the date of this Objection, the Committee has been unable to resolve its differences with the Debtors with respect to the GUC Trust Agreement and, accordingly, such consent has not been provided.

[61] Under §1.1.9 of the Plan, "Administrative Claims" include Allowed Professional Claims.

treatment plainly violates this Court's July 17, 2015 order that "the avoidance actions belong to the Unsecured Creditors . . . the Unsecured Creditors will be assured they at least have those."[62] This Court should not countenance such a plain violation of its prior order.

76.     Moreover, by seeking reimbursement from the GUC Trust for Allowed Professional Claims in excess of budgeted amounts, the Debtors in effect seek to impose a "cap" on their administrative expense liabilities.    But this is also impermissible under Circuit precedent.  See In re TCI 2 Holdings, LLC, 428 B.R. 117, 174 (Bankr. D.N.J. 2010) ("The Code does not permit a plan to cap the amount to be paid toward administrative expenses without the consent of the claimants.").

**B.     Furthermore, The ABL Lenders And Term Lenders Are Already Obligated To Fund The Costs Of These Cases (Including Payment Of Administrative Claims).**

77.     The ABL Lenders and Term Lenders chose to use the chapter 11 process as a venue in which to foreclose upon their collateral.  As a result, at this Court's July 27th DIP Hearing, at which time the Court granted the ABL Lenders and Term Lenders Section 506(c) and 503(b) waivers, as part of the *quid pro quo* the Court ordered the ABL Lenders and Term Lenders "to pay for . . . the administrative expenses or all expenses that are anticipated to accrue during the period of the [chapter 11] process."[63]  Moreover, while the ABL Lenders and Term Lenders may have purported to place a limitation on such fees in the DIP "carve-out," such a provision does not override the Bankruptcy Code's requirement that all administrative claims be paid in full and in cash.  Accordingly, the Debtors may not now seek to unload the obligations of the ABL Lenders and Term Lenders onto the backs of unsecured creditors.

---

[62] See *Transcript of July 17, 2015 Hearing* [Docket No. 276] (the "July 17 Hrg. Tr."), at 107:17-18; 22-23.

[63] See July 17 Hrg. Tr. at 106:7-12.

**C.      Finally, The Plan Must Be Amended To Provide That The Debtors'**
**Unencumbered Assets Constitute GUC Trust Assets Available For Unsecured**
**Creditors.**

78.      The Debtors have already conceded that they have three primary types of

unperfected collateral that properly belong to unsecured creditors: (i) an assortment of vehicles

owed by the Debtors whose certificates of title do not notate a lien in favor of the Prepetition

Revolving Loan Agent; (ii) unscheduled commercial tort claims; and (iii) a certain life insurance

policy in which the Debtors hold a beneficial interest (collectively, the "Unencumbered

Assets").[64]  And yet, in the most recently-filed *Debtors' Amended Joint Prearranged Chapter 11*

*Plan* [D.I. 470] dated September 4, 2015, GUC Trust Assets are still defined as including only

the Debtors' Avoidance Actions.  See Plan §1.1.91.  Therefore, the Plan language must be

amended to provide that GUC Trust Assets also include the Debtors' Unencumbered Assets.

79.      Accordingly, the Debtors' proposed universe of GUC Trust Assets and the

imposition of the GUC Trust Waterfall violate the Bankruptcy Code and this Court's prior

orders.  For these reasons as well, the Plan may not be confirmed.

**III.      THE PLAN SHOULD NOT BE CONFIRMED BECAUSE IT**
**INCORPORATES IMPERMISSIBLE RELEASE AND EXCULPATION**
**PROVISIONS.**

80.      The Debtors bear the burden of proving that the Plan's proposed releases of third

parties by the Debtors (the "Debtor Releases") are appropriate under the Bankruptcy Code and

applicable law in this Circuit.  See Gillman v. Cont'l Airlines (In re Cont'l Airlines), 203 F.3d

203, 214 (3d Cir. Del. 2000) (proponent bears burden of establishing propriety of proposed

---

[64] See Letter from Robert S. Brady to Steven D. Pohl dated August 26, 2015, attached hereto as **Exhibit D**, at 2
("Debtors have confirmed that the Prepetition Revolving Loan Agent will not assert properly perfected liens on the
vehicles, the life-insurance policy related to Mr. S. Kanthamneni, and unscheduled commercial tort claims.").  The
Term Lenders have similarly agreed not to assert properly-perfected liens on the Unencumbered Assets.  See Email
from Tem Lenders' counsel to Committee counsel dated September 4, 2015 (10:42PM EST).

releases); In re Global Ocean Carriers Ltd., 251 B.R. 31, 43 (Bankr. D. Del. 2000).   In this

Circuit, releases of non-debtors are the exception, not the rule.   See In re Washington Mut., Inc.,

442 B.R. 314, 351 (Bankr. D. Del. 2011).   For the reasons identified below, the Debtors cannot

meet their burden of proof that the Debtor Releases and Exculpation Provision are proper under

applicable law.   Therefore, the Plan cannot be confirmed.

### A.    The Debtor Releases Are Improper In Three Respects.

81.    Section 8.2 of the Plan includes the proposed Debtor Releases.   In pertinent part,

the provision reads as follows:

> [E]ach of the Debtors, the Reorganized Debtors, the GUC Trust, the GUC Trustee, and
> the Estates conclusively, absolutely, unconditionally, irrevocably, and forever discharge
> and release and shall be deemed to have provided a full discharge and release to each
> ***Released Party***[65] . . . from any and all Claims, obligations, debts, rights, suits, damages,
> Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims
> asserted or which could be asserted on behalf of the Debtors and/or the Reorganized
> Debtors, whether known or unknown, foreseen or unforeseen, existing or arising, in law,
> equity, or otherwise, that the Debtors, the Reorganized Debtors, the GUC Trust, the GUC
> Trustee, the Estates, or their Affiliates would have been legally entitled to assert in their
> own right . . . based on or relating to, or in any manner arising from, in whole or in part,
> the Debtors, the Reorganized Debtors, the Transaction, the Chapter 11 Cases, the
> purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the
> Reorganized Debtors, any payments, distributions, or dividends any Debtor or Affiliate
> paid to or received from any Released Party, ***fraudulent or preferential transfer or
> conveyance***, tort, contract, ***breach of fiduciary duty***, violation of state or federal laws,
> including securities laws, negligence, ***gross negligence***,…

See Plan, Section 8.2 (emphasis added).

82.    The Debtor Releases are impermissible for three reasons.   First, the Debtors seek

to release—for no consideration—the ABL Facility Lenders, the Term Loan Lenders, the

---

[65] "Released Party" is defined in §1.1.134 of the Plan to mean: (a) each Debtor and Reorganized Debtor; (b) the
Debtors' current and former officers and directors; (c) the Term Loan Agent; (d) the Term Loan Lenders; (e) the
ABL Facility Agent; (f) the ABL Facility Lenders; (g) the DIP Term Facility Agent; (h) the DIP Term Facility
Lenders; (i) the DIP ABL Facility Agent; (j) the DIP ABL Facility Lenders; (k) the Sponsor; (l) the ABL Facility
Guarantor; (m) the parties to the Plan Support Agreement; and (n) each of the foregoing entities' respective current
and former: predecessors, successors and assigns, and stockholders, members, limited partners, general partners,
equity holders, Affiliates and its and their subsidiaries, principals, partners, members, employees, agents, officers,
directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants,
investment bankers, and consultants, in each case solely in their capacity as such.

Debtors' current and former officers and directors, and Access (as Sponsor), notwithstanding the potential existence of valuable estate claims against such parties that the Committee has a right to investigate.  Second, the Debtors seek to release the Released Parties from instances of gross negligence and willful misconduct, in contravention of applicable law.  Third, the Debtors seek to release the Released Parties "from any and all Claims…based on or relating to…fraudulent or preferential transfer or conveyance."  See Plan §8.2.  But this directly contradicts this Court's July 17, 2015 order that **all** Avoidance Actions properly belong to unsecured creditors.

> **i.    The Debtors unjustifiably seek to release, for no consideration, current and former directors and officers as well as Access, notwithstanding the potential existence of valuable claims against such parties.**

83.    Under the Plan, the Debtors' current and former officers and directors (including Gregg Eisenberg[66]), the ABL Lenders, the Term Lenders, and Access[67] (as Sponsor), are "Released Parties."  Plan §1.1.134.  However, these Debtor Releases violate applicable law in this Circuit because (i) such parties have not made a substantial contribution to the Plan, and (ii) such releases are not necessary to the Plan.

84.    Courts in this district apply the five-factor Zenith Electronics test to determine whether a debtor's release of a non-debtor under a chapter 11 plan is appropriate:

(1) An identity of interest between the debtor and the third party such that a suit against the non-debtor will deplete estate assets;

(2) A substantial contribution to the plan by the released party;

(3) The necessity of the release to the plan;

---

[66] Gregg Eisenberg was president and CEO of Boomerang until February 19, 2015, when he was terminated by the Board.  See Nystrom 7.2 Dep. Tr. at 29:15-16; 69:10-15.

[67] At all relevant times, Access controlled 4 members of Boomerang's 7-member Board.  See Nystrom 7.2 Dep. Tr. at 31:12-14; 36:20-22.  ("Q. Of that seven, four are affiliated in some respect with Access; is that correct? A. Yes.").

(4) The overwhelming acceptance of the plan and release by creditors and interest holders; and

(5) The payment of all or substantially all of the claims of the creditors and interest holders under the plan.

See In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999); In re Exide Techs, 303 B.R. at 72 (Bankr. D. Del. 2003).  The five Zenith factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness."  In re Washington Mut., Inc., 442 B.R. at 346.  The Debtors have the burden of establishing that the Debtor Releases satisfy the Zenith factors.  See In re Global Ocean Carriers Ltd., 251 B.R. at 43.

85.    The Debtor Releases of the Debtors' current and former directors and officers and Access are virtually identical to the debtors' proposed releases in In re Washington Mut., Inc., 442 B.R. at 351 ("WaMu"), which this Court denied.  In WaMu, as here, the debtors sought to release their "current and former officers [and] directors."  Id. at 349.  Applying the five-factor Zenith test, this Court found that although an identity of interest existed between the debtors and their former officers and directors, that fact "alone is insufficient to justify the releases."  Id. Turning to the remaining Zenith factors, the Court concluded there was "simply no basis" for the releases because the debtors could present no evidence to show (i) a "substantial contribution" made to the case by the former directors and officers or (ii) that such releases were necessary for the reorganization.  Id. at 350.  Here, members of the Debtors' Board have conceded that Eisenberg, for instance, has not provided any consideration in exchange for his release under the Plan.[68]

86.    Moreover, and particularly relevant to Access's role in these Cases, the WaMu Court also rejected the debtors' proposed release of certain settlement noteholders, ruling that the

---

[68] See *Final Deposition Transcript of Deposition of Don Wagner dated September 9, 2015* (the "Wagner Dep. Tr."), at 54:14-22.

noteholders' self-interested participation in settlement negotiations with the debtors was an "insufficient contribution to warrant a release by the Debtors." Id. at 349.  Likewise, Access's self-interested participation in the PSA and Plan negotiation process does not constitute a sufficient contribution to the Plan to warrant such a generous release.  See id.  Furthermore, Access has provided no consideration for its release under the Plan.[69]  Nor have the ABL Lenders or the Term Lenders provided consideration in exchange for their Debtor Releases.[70]

### ii.    The Debtors impermissibly seek to release the Released Parties from instances of gross negligence and willful misconduct.

87.    Through section 8.2 of the Plan, the Debtors seek to release the Released Parties from all instances of gross negligence and willful misconduct.  Plan §8.2.

88.    The Debtors' attempt to absolve the Released Parties from all instances of gross negligence and willful misconduct is a plain violation of applicable law.  See In re Genesis Health Ventures, 266 B.R. at 607 (ordering debtors to modify releases which sought to release debtors' officers, directors, employees, and professionals, as well as administrative agent for senior lender, from instances of "gross negligence or willful misconduct," and finding there is "no basis" for such releases that go "beyond any applicable standard of liability"); Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.), 370 B.R. 452, 461 (B.A.P. 1st Cir. 2007) (finding that third party release purporting to cover gross negligence and willful misconduct "renders a plan unenforceable").

---

[69] Access has identified its decision to forego certain management fees under its Second Amended and Restated Management Consulting Agreement as the consideration provided for its Plan release.  See Wagner Dep. Tr. at 92:14-93:13.  However, such fees—had they been assessed—would have been grouped with general unsecured claims currently scheduled for a de minimis recovery under the Plan.  As a result, Access has not actually relinquished any meaningful right to payment.

[70] That the ABL Lenders and Term Lenders have bargained for releases under their applicable DIP Financing documents is of no moment with respect to whether they may be released under the Plan, as such releases were expressly limited to the ABL Lenders' and Term Lenders' roles in providing the DIP Financing.  See, e.g., Term DIP Order ¶ 47.

### iii. The Debtors impermissibly seek to release the Released Parties from certain Avoidance Actions that belong to unsecured creditors, in contravention of this Court's order.

89.     This Court's July 17, 2015 order was unambiguous: "the avoidance actions belong to the Unsecured Creditors."[71]

90.     However, "Avoidance Actions" are defined in the Plan as "any and all Claims against *any non-Released Party* to avoid a transfer of property or an obligation incurred by the Debtors pursuant to sections 544, 545, 547, 548, 550, or 551 of the Bankruptcy Code."  Plan §1.1.12 (emphasis added).  And in section 8.2 of the Plan, the Debtors seek to release the Released Parties from "any and all Claims…arising from…*fraudulent or preferential transfer* or conveyance."  Plan §8.2 (emphasis added).  In other words, the Debtors seek to insulate the Released Parties from any and all liability arising under Bankruptcy Code Sections 547 (preferential transfers) and 548 (fraudulent conveyance).  Furthermore, the Plan's definition of "Released Party" is so sweepingly broad that it insulates virtually all plausible defendants from future liability.  This Court should not countenance such a blatant disregard of its prior order.

91.     In view of the foregoing, the illegal Debtor Releases render the Plan incapable of confirmation.

### B. The Plan Cannot Be Confirmed Because It Impermissibly Releases—For No Consideration—The ABL Lenders From Potential Preference Actions.

92.     As discussed *supra*, this Court has expressly proscribed the Debtors from releasing any Avoidance Actions.  See July 17 Hrg. Tr. at 107:17-18 (stating that the Debtors' "avoidance actions belong to the Unsecured Creditors.  There is no lien on them.").  Despite this

---

[71] See July 17 Hrg. Tr. 107:17-18.  Colloquially-speaking, the term "avoidance actions" is commonly understood to include the trustee's power to avoid: (i) transfers and liens on the debtor's property that could have been avoided by a creditor under applicable local law (11 U.S.C. §544); (ii) statutory liens (11 U.S.C. §545); (iii) prepetition preferential transfers (11 U.S.C. §547); (iv) fraudulent conveyances (11 U.S.C. §548); and (v) certain postpetition transfers (11 U.S.C. §549).  Therefore, per this Court's order, *all* of these actions belong to unsecured creditors.

prohibition, section 8.2 of the Plan releases, *inter alia*, the ABL Facility Agent and the ABL

Facility Lenders from any and all Claims arising from "preferential transfer or conveyance."  See

Plan §8.2.  Moreover, on August 26, 2015, the Debtors informed the Committee that they seek to

"resolve any such [preference] actions [against the Prepetition Revolving Loan Agent] through . .

. their chapter 11 plan."[72]  Evidently, the Debtors' proposed resolution is to grant the ABL

Lenders a full release without any concomitant contribution to the Plan.  Such treatment violates

not only this Court's order, but also this Circuit's requirement, discussed *supra*, that released

parties provide a "substantial contribution" to the Plan in exchange for any release.  See In re

Zenith Elecs. Corp., 241 B.R. at 110; In re Washington Mut., Inc., 442 B.R. at 346.

93.    As described more fully in the draft complaint attached hereto as **Exhibit C** (the

"Preference Action"), the Committee has colorable preference claims against the ABL Lenders

that the Debtors may not release.  Indeed, by the very filing of this Objection, the Committee

hereby expresses its intent to pursue the Preference Action.[73]

94.    To the extent the Court believes it necessary to first grant the Committee standing

with respect to the Preference Action, the Committee manifestly satisfies the standing

---

[72] See Letter from Robert S. Brady to Steven D. Pohl dated August 26, 2015, attached hereto as **Exhibit D**, at 2

[73] See *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Revolving Loan Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), and 364(e) and (B) Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Revolving Loan Lenders, and (III) Granting Related Relief* [D.I. 293] (the "Final ABL DIP Order") ¶ 7(a) ("During the Investigation Period, a Challenge Party shall be entitled to determine whether a good faith basis to assert a Challenge exists.  If a Challenge Party identifies a good faith basis to assert a Challenge, it shall notify the Debtors prior to the expiration of the Investigation Period of its demand that the Debtors initiate an action or adversary proceeding relating thereto (a "Challenge Notice").  ***For the avoidance of doubt, the filing of an objection to plan confirmation which specifically and expressly identifies a good faith basis to assert an Affirmative Challenge shall constitute a Challenge Notice for purposes hereof.***  The Debtors shall notify the applicable Challenge Party of whether the Debtors intend to initiate such action or adversary proceeding, or enter into a settlement of the matters subject to such Challenge, within five (5) business days of receipt of a Challenge Notice.  If the Debtors elect to initiate such action or adversary proceeding, or file a motion to settle such Challenge, they must do so within ten (10) business days of such notice to a Challenge Party.  If the Debtors do not timely notify such Challenge Party that the Debtors intend to initiate the action or adversary proceeding or a settlement of the matters related to the Challenge Notice, do not timely initiate such action or adversary after timely notice, or notify the Challenge Party that the Debtors do not intend to initiate such action or adversary proceeding, then in each such case the Challenge Party shall have ten (10) business days from the applicable date to file a motion seeking standing from the Court to initiate such action or adversary proceeding.") (emphasis added).

requirements of this Circuit.  Since the Third Circuit's <u>Cybergenics</u> decision, courts have found authority to grant creditors' committees standing to pursue estate causes of action in Bankruptcy Code sections 1103(c) and 1109(b).  <u>See</u> <u>Official Comm. of Unsecured Creditors</u> <u>ex rel.</u> <u>Cybergenics Corp. v. Chinery</u>, 330 F.3d 548, 553 (3d Cir. 2003) ("We believe that Sections 1109(b) [and] 1103(c)(5) . . . evince Congress's approval of derivative avoidance actions by creditors' committees, and that bankruptcy courts' equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-possession unreasonably refuses to pursue an avoidance claim."); 11 U.S.C. § 1109(b) ("A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."); <u>id.</u> § 1103(c)(5) (In addition to its enumerated powers, a creditors' committee may "perform such other services as are in the interest of those represented.").

95.    Courts following <u>Cybergenics</u> have developed a three-part test to evaluate creditors' committees' requests for standing.  <u>See, e.g.</u>, <u>Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)</u>, 527 B.R. 169, 173 (D. Del. 2015) ("Derivative standing requires a party to show three elements:  '(1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to initiate the action.'") (quoting <u>Infinity Inv'rs Ltd. v. Kingsborough (In re Yes! Entm't. Corp.)</u>, 316 B.R. 141, 145 (D. Del. 2004)).[74]  Here, each of these factors is satisfied.

---

[74] The first and second <u>Cybergenics</u> factors present an overlapping inquiry, in that a debtor in possession's refusal to pursue a claim is unjustifiable where the claim is colorable and "there [is] potential for a considerable benefit to the estate."  <u>Official Comm. of Unsecured Creditors v. CIBC Wood Gundy Ventures, Inc. (In re Temtechco, Inc.)</u>, No. 95-00596, 1998 WL 887256, at *7 (Bankr. D. Del. Dec. 18, 1998) (citing <u>Unsecured Creditors' Comm. v. Noyes (In re STN Enters.)</u>, 779 F.2d 901, 905 (2d Cir. 1985)).

96.     First, with respect to the requirement that the Preference Action be colorable, the Committee is able to establish each of the elements of Bankruptcy Code section 547(b), as set forth in the greater detail in the draft complaint attached hereto as **Exhibit C**:

- The net value transferred, in the form of cash paid and liens granted, to the Defendants (as defined in **Exhibit C**) constitute transfers of interests of the Debtors in property;

- Such transfers were made to or for the benefit of the Defendants;

- Such transfers were made on account of the ABL Facility;

- The Debtors are presumed to have been insolvent at all relevant times, pursuant to the Bankruptcy Code;[75]

- Such transfers were made during relevant period; and

- Because the Defendants remained undersecured even on the Petition Date, there can be no argument that they would have received as much in a hypothetical liquidation under chapter 7 had such transfers not been made.[76]

97.     Second, with respect to whether the Debtors have unjustifiably refused to pursue the Preference Action, as the Court has confirmed, the proceeds of the Debtors' "avoidance actions belong to the Unsecured Creditors.  There is no lien on them."[77]  Thus, any amount of the $4,496,997.94 in such preferential transfers recovered would enter the Debtors' estates unencumbered and be available for distribution to unsecured creditors.  Given this, the second Cybergenics factor is satisfied.

98.     Third, with respect to whether the Bankruptcy Court has granted the Committee permission to initiate the Preference Action, the Committee has filed this motion and otherwise

---

[75] In the event the Court approves the Lazard Valuation, it will necessarily find that the Debtors were insolvent.  In the event the Court approves the A&M Valuation, it will necessarily find that the Debtors were solvent.

[76] In addition, the Committee has analyzed the affirmative defenses available under Bankruptcy Code section 547(c)—including, in particular, the "improvement in position" defense of section 547(c)(5)—and is of the view, based on its diligence to date and the information available to it, that the Defendants would not be able to plead any such defense successfully.  Accordingly, the first Cybergenics factor is satisfied.

[77] July 17 Hrg. Tr. at 107:17-18.

complied with the "Challenge Procedure" set forth in the Court's Final ABL DIP Order.  The

Committee thus submits that all three <u>Cybergenics</u> factors have been satisfied and that standing,

if necessary, should be granted.[78]

99.      Accordingly, the Plan may not be confirmed until section 8.2 thereof is amended

to account for the Committee's right to pursue the Preference Action.

### C.      The Plan's Exculpation Provision Is Impermissibly Broad Insofar As It Seeks To Exculpate Non-Estate Fiduciaries.

100.      Section 8.4 of the Plan provides an exculpation clause (the "<u>Exculpation</u>

<u>Provision</u>") which provides in pertinent part:

> Notwithstanding anything contained herein to the contrary, the ***Exculpated Parties***[79]
> shall neither have, nor incur any liability to any Entity for any prepetition or postpetition
> act taken or omitted to be taken in connection with . . . the Chapter 11 Cases

---

[78] The Committee also hereby seeks standing to object to any and all claims of the Prepetition Revolving Agent and Prepetition Revolving Loan Lenders, as set forth in the draft complaint attached hereto as **Exhibit C.**

Bankruptcy Code section 502(a) provides that a claim "is deemed allowed, unless a party in interest . . . objects." As noted above, a "party in interest" includes "a creditor" and "a creditors' committee." 11 U.S.C. § 1109(b).  Thus, under the plain language of the Bankruptcy Code, "the right of a creditor to object to the allowance of another creditor's claim should be undisputed on principle."  4 <u>Collier on Bankruptcy</u> ¶ 502.02[1][d]; <u>see also</u> <u>In re The</u> <u>Charter Co.</u>, 68 B.R. 225, 228 (Bankr. M.D. Fla. 1986) ("the Court will not disregard the plain language of § 502(a) and limit the right of general creditors to object to the allowance of a proof of claim in a chapter 11 proceeding").

As an alternative grounds, a court will find that "[a] creditor or creditors' committee has standing . . . to object to another creditor's claim *as long as it has something to gain if it prevails*."  <u>Official Creditors' Comm. v.</u> <u>Electrochem Funding, LLC (In re QMect, Inc.)</u>, 349 B.R. 620, 625 (N.D. Cal. 2006) (emphasis added); <u>see also</u> <u>In re</u> <u>The C.P. Hall Co.</u>, 53 B.R. 540, 543 (Bankr. N.D. Ill. 2014) ("A creditor's interest in a bankruptcy case is pecuniary, and so a creditor is a 'party in interest' with standing to object to the claims of other creditors."); <u>In re Am. Punjab</u> <u>Corp.</u>, 150 B.R. 763, 765 (E.D. Cal. 1993) ("when the Committee first filed its objection to claim, it no doubt had standing to raise and prosecute the objection because it had not yet been paid").

Here, section 502(d) of the Bankruptcy Code requires that the claims of the Prepetition Revolving Loan Agent and Prepetition Revolving Loan Lenders be disallowed unless and until the ABL Transfers have been returned. Moreover, as noted above, any recovery from the ABL Preference Actions would be available to fund recoveries to unsecured creditors.  Accordingly, the Committee has "something to gain if it prevails" in objecting to the ABL Claims—namely, compelling the return of the ABL Transfers to fund recoveries to general unsecured creditors.  The Committee thus submits that the foregoing standards have been satisfied and that standing should be granted.

[79] "Exculpated Party" is defined in §1.1.66 of the Plan to mean (a) each Debtor and Reorganized Debtor; (b) the Debtors' current and former officers and directors; (c) the Term Loan Agent; (d) the Consenting Term Loan Lenders; (e) the ABL Facility Agent; (f) the ABL Facility Lenders; (g) the DIP Term Facility Agent; (h) the DIP Term Facility Lenders; (i) the DIP ABL Facility Agent; (j) the DIP ABL Facility Lenders; (k) the Sponsor; (l) the ABL Facility Guarantor; (m) the parties to the Plan Support Agreement; (n) the Creditors Committee and each of its members; and (o) each of the foregoing entities' respective current and former: predecessors, successors and assigns, and stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their

See Plan §8.4 (emphasis added).

101.   As stated by the Court in In re Washington Mut., Inc., an "exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding" 442 B.R. at 350-51 (emphasis added).   The Court in In re Tribune Co. voiced its agreement with the holding in Washington Mut. and similarly held that an exculpation clause "must exclude non-fiduciaries." 464 B.R. 126, 189 (Bankr. D. Del. 2011) (quoting Washington Mut., 422 B.R. at 350-51); accord In re PTL Holdings LLC, 55 Bankr. Ct. Dec. 206, 2011 Bankr. LEXIS 4436, *38 (Bankr. D. Del. Nov. 10, 2011) (Shannon, J.) (sustaining U.S. Trustee's objection to exculpation clause and stating that such clause "*must be reeled in to include only those parties who have acted as estate fiduciaries and their professionals.*") (emphasis added); Hearing Transcript, In re Ashinc Corporation, No. 12-11564-CSS (Bankr. D. Del. Sept. 10, 2015) (Sontchi, J.), at 32:23-33:1 ("I find and hold that exculpation provisions, such as the one at issue here, are *not available in any circumstances for any party that is not an estate fiduciary*.") (emphasis added).

102.   Here, the Plan's Exculpation Provision does not comply with the applicable caselaw set forth above, as it covers many parties who are not estate fiduciaries in these Cases. In fact, the only parties eligible for exculpation as "Exculpated Parties" under the Plan are the Debtors, the Debtors' officers serving during the Cases in their capacity as such, the Committee, and their respective attorneys, financial advisors and other professionals.   See Washington Mut., 442 B.R. at 350-51; In re Tribune Co., 464 B.R. at 190.   All of the other purported "Exculpated Parties," including the parties to the Plan Support Agreement, and those parties' respective

---

subsidiaries, principals, partners, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case solely in their capacity as such.

officers, directors, affiliates, professionals and the like, are not estate fiduciaries and may not be exculpated.

## IV.   THE PLAN SHOULD NOT BE CONFIRMED BECAUSE IT UNFAIRLY DISCRIMINATES AGAINST UNSECURED CREDITORS.

103.    The Plan also may not be confirmed because, for the reasons discussed below, it discriminates unfairly against unsecured creditors in violation of Section 1129(b)(1) of the Bankruptcy Code.

### A.   The Debtors' Numerous Preferential Settlements With Certain Purported "Critical" Vendors Constitute Unfair Discrimination Against Unsecured Creditors.

104.    This Court's Final Critical Vendors Order[80] authorized the Debtors to pay the prepetition claims of Critical Vendors in an aggregate amount not to exceed $7.25 million, *provided, however,* that "such payment is ***necessary to avoid irreparable harm*** to the Debtors and their estates."   See Final Critical Vendors Order ¶ 4 (emphasis added).[81]   Manifestly, this Court did not grant the Debtors carte blanche to make selective payments to certain preferred vendors at the expense of non-preferred unsecured creditors.   And yet, as of the date of this writing, the Debtors continue to negotiate preferential settlements with a small subset of preferred vendors.   The Debtors' effective creation of two sets of unsecured creditors—a favored set of preferred vendors and an underclass of "ordinary" unsecured creditors—constitutes impermissible "unfair discrimination" under Section 1129(b)(1) of the Bankruptcy Code.

---

[80] See *Final Order (A) Authorizing The Debtors To Pay Certain Prepetition Claims of Critical Vendors, Shippers, Warehousemen, and Possessory Lien Holders and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests* [D.I. 207] (the "Final Critical Vendors Order").

[81] Moreover, in the Debtors' Critical Vendors Motion [D.I. 11], the Debtors stated that "[t]he need for the flexibility to pay Vendor Claims is particularly acute in the period immediately following the Petition Date."   Critical Vendors Motion ¶ 15.

105.    Under Section 1129(b)(1) of the Bankruptcy Code, the Debtors must also satisfy their burden of proof that the Plan "does not discriminate unfairly" with respect to each impaired dissenting class.   11 U.S.C. §1129(b)(1); see Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa P'ship), 115 F.3d 650, 653 (9th Cir. 1997) (debtor bears burden of proof that discrimination is not unfair).   This Circuit adopts the rebuttable presumption test (also known as the "Markell Test"), under which a rebuttable presumption of unfair discrimination arises when there is: (i) a dissenting class; (ii) another class of the same priority; and (iii) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments) or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution. See In re Armstrong World Indus., Inc., 348 B.R. at 121; In re Dura Auto. Sys., 379 B.R. 257 at 271; Exide Techs., 303 B.R. at 78-79; Genesis Health, 266 B.R. at 611.   In other words, the prohibition on unfair discrimination "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes."   In re 222 Liberty Assocs., 108 B.R. 971, 990-91 (Bankr. E.D. Pa. 1990).

106.    Through their ongoing negotiations and settlements with certain purported critical vendors, the Debtors have in effect created two classes of unsecured creditors: (i) a cache of preferred critical vendors; and (ii) an underclass of ordinary unsecured creditors. As of this writing, the Debtors have reached settlements with █ purported critical vendors holding a total of approximately ███████ of claims against the estate, which amount constitutes approximately ███ of the Debtors' total critical vendor claims.  The Debtors have paid an average of ████████ for claims at or below ████ and ██████████ for

claims in excess of ███████. Meanwhile, the vast majority of the Debtors' approximately $40.0 million in other unsecured claims are stuck with the *de minimis* recovery proposed through the GUC Trust. The only distinguishing characteristic dividing the two classes of unsecured creditors is the Debtors' purported determination that certain creditors are "critical" to the Debtors' businesses, while others are not.

107. In the first instance, the Committee seriously doubts that the Debtors' purported "critical" vendors are indeed critical to the Debtors' business under applicable law. In order to qualify as a "critical vendor," the vendor's business relationship with the debtor must be "critical to the Debtors' reorganization" or "essential to the survival of the debtor." See In re Just For Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999). Under Section 363(b) of the Bankruptcy Code, a debtor must "articulate some business justification, other than the mere appeasement of major creditors," to pay prepetition claims. See In re James A. Phillips, Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983). Moreover, a debtor must show that payment of such prepetition claims "is the only means to effect a substantial enhancement of the estate" by satisfying the following three-prong test: (i) it must be critical for the debtor to deal with the claimant; (ii) by failing to deal with the claimant, the debtor risks the probability of harm or loss of economic advantage which is disproportionate to the amount of the claimant's prepetition claim; and (iii) there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim. See In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

108. Here, the fact that the Debtors continue (as of the date of this Objection) to negotiate payoff amounts with purported "critical" vendors—***99 days after the Petition Date and 33 days after this Court's approval of the Disclosure Statement***—belies any assertion that these creditors are "essential to the survival" of the Debtors. See In re Just For Feet, Inc., 242 B.R. at

826.  If that were the case, these Cases would have already collapsed into a chapter 7 liquidation.

Consider, for example, that as of this writing the Debtors are negotiating a purported "critical

vendor" payment to a large vendor of between ███████████████ on account of such

vendor's prepetition claim.  Plainly, at this stage of these Cases, this purported "critical" vendor

cannot be considered essential to the Debtors' survival.   Rather, the Debtors are using the

Bankruptcy Code's limited critical vendor framework as a means to renegotiate existing

contracts and identify more favorable future supply arrangements.  By offering "special favor[s]

or inducements" to preferred creditors this late into these Cases, the Debtors run roughshod over

the Bankruptcy Code's guarantee of "equality between creditors."  See Am. United Mut. Life

Ins. Co. v. Avon Park, 311 U.S. 138, 147 (1940).[82]

109.    In these Cases, the Debtors' generous payments to certain preferred vendors,

when juxtaposed with the *de minimis* recovery proposed for non-preferred unsecured creditors,

plainly constitute unfair discrimination.   Courts disapprove of discrimination where the

difference in percentage recovery is large.  See In re Sentry Operating Co. of Tex., Inc., 264 B.R.

850, 863-64 (Bankr. S.D. Tex. 2001) (denial of plan confirmation where plan paid 100% to one

class of unsecured creditors, while remaining unsecured creditors were paid 1% of claims); In re

Aztec Co., 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (unfair discrimination to pay insider

unsecured claims in full while paying other unsecured claims 3%).  Here, in many instances the

---

[82] Furthermore, the Debtors' invocation of the so-called "doctrine of necessity" as justification for their payment of these critical vendor claims is inapposite.  Indeed, all Circuit level appellate courts to which the issue has been raised have confirmed that the Doctrine of Necessity does not actually exist in non-railroad Chapter 11 proceedings.  See, e.g., In re Kmart Corp., 359 F.3d 866, 871 (7th Cir. 2004) (stating that doctrine of necessity is "just a fancy name for a power to depart from the Code."); Chiasson v. J. Louis Matherne and Assocs.  (In re Oxford Mgmt., Inc.), 4 F.3d 1329, 1334 (5th Cir. 1993) (postpetition payment of prepetition claims outside a plan "deviated from the pro rata scheme of distribution envisioned by the Code"); Official Comm. of Equity Sec. Holders v. Mabey, 832 F.2d 299, 302 (4th Cir. 1987) ("The Bankruptcy Code does not permit a distribution to unsecured creditors in a Chapter 11 proceeding except under and pursuant to a plan of reorganization that has been properly presented and approved."); In re B&W Enterprises, Inc., 713 F.2d 534 at 537 ("no indication that Congress intended the [C]ourts to fashion their own rules of super-priorities within any given priority class").

Debtors have reached settlements with purported critical vendors at between ████████ ███████, while non-preferred unsecured creditors may receive nothing under the Plan.  Such dissimilar treatment for similarly situated creditors is forbidden under the Bankruptcy Code.

110.    The case of In re Sentry Operating Co. of Tex., Inc., 264 B.R. 850 (Bankr. S.D. Tex. 2001) is particularly instructive.  In Sentry, the debtor and its secured lender proposed a plan that would pay a class of trade claims in full while paying 1% on other unsecured claims. See id. at 862.  In applying the Markell Test, the Court observed that whether a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy is a factor that is best viewed in the context of the prepetition rights of creditors and their respective legitimate expectations about relative rights and likelihood of payment.  See id. at 864.  Because the two classes of creditors in Sentry had equal prepetition rights, the court concluded the payout differential was unjustified and therefore the debtors could not rebut the presumption of unfair discrimination.  See id. at 864.

111.    As in Sentry, the Plan fails the Markell test.  Disfavored unsecured creditors receive virtually nothing under the Plan; meanwhile, a favored set of purported critical vendors will receive (or have received) ██████████████████ payout on their unsecured claims. Therefore, under the Markell Test, a presumption arises that the Plan unfairly discriminates against non-favored unsecured creditors.  This unfair discrimination precludes confirmation of the Plan.

### B.    The Debtors' Assumption Of The Access Management Agreement Constitutes Unfair Discrimination Against Unsecured Creditors.

112.    In the Second Amended and Restated Management Consulting Agreement entered into the day before these Cases were filed (the "Access Management Agreement")[83] between Boomerang and Access, Access managed to convince the ABL Lenders and Term Lenders to keep its indemnify in place (albeit modestly narrowed) notwithstanding that Access would no longer own its prepetition equity and no longer "manage" the business under a management agreement.  Access pulled this off by having its clearly "no longer of value to the Debtors" management agreement modified and assumed, thus turning what should be a prepetition unsecured claim for rejection of the management agreement into an assumed, postpetition obligation.[84]  Indeed, Access points to its foregoing of future management fees as a form of consideration provided in exchange for its release under the Plan.[85]

113.    The unjustifiable discrepancy in treatment between Access (for its indemnity) and unsecured creditors constitutes unfair discrimination under the Bankruptcy Code.  See In re Barney & Carey Co., 170 B.R. 17, 25 (Bankr. D. Mass. 1994) (finding unfair discrimination where debtor offered "no reason or legitimate basis" for paying one unsecured creditor a 100 percent recovery while a similarly situated creditor would receive only a 15 percent recovery).

---

[83] This is one more fact that shows how Access and the Board "took care of their own" when the ship was abandoned to the ABL Lenders and Term Lenders.

[84] In their *Notice to Counterparties to Executory Contracts and Unexpired Leases Potentially Being Assumed Under the Plan* [D.I. 487] filed on September 11, 2015, the Debtors schedule the Access Management Agreement as a contract potentially being assumed under the Plan.

[85] See Wagner Dep. Tr. at 92:14-18 ("Q. And what is it that Access is providing as consideration for the release?  A. Well, there were ongoing management fees that Access had deferred, had not received from the company for an extended period of time.").

## V.    THE PLAN SHOULD NOT BE CONFIRMED BECAUSE IT IS NOT PROPOSED IN GOOD FAITH.

114.    Bankruptcy Code Section 1129(a)(3) provides that a plan must be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. §1129(a)(3).  Although the Bankruptcy Code does not define "good faith", see, e.g., In re Genesis Health Ventures, Inc., 266 B.R. 591 at 609, courts in this Circuit have opined that the "good faith" standard requires that the Plan be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code."  In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001); see also Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors (In re Lernout & Hauspie Speech Prods, N.V.), 308 B.R. 672, 675 (D. Del. 2004); In re WR Grace & Co., 729 F.3d 332, 346 (3d Cir. 2013).  Good faith also requires a showing that the plan "reflects fundamental fairness in dealing with creditors."  See In re Genesis Health Ventures, Inc., 266 B.R. at 609. "The determination of good faith must be based on the totality of the circumstances."  Id.

115.    A plan cannot comply with the "good faith" principle if it deprives unsecured creditors of their due value entitlements and reallocates such entitlements to favored parties. See, e.g., Quigley, 437 B.R. 102 (plan process benefitting certain preferred creditors to the detriment of others not proposed in "good faith"); In re Bush Indust., 315 B.R. 292 (Bankr. W.D.N.Y. 2004) (plan that included preferred treatment for an insider violated "good faith" requirement); In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213 at 240 ("[The] treatment of classes of claims is always subject to the good faith requirements of §1129(a)(3).").

116.    Here, the Plan's lopsided value transfer to the Term Lenders at the expense of unsecured creditors betrays a disregard for the Bankruptcy Code's objective of "fundamental fairness and justice."  See In re ACandS, Inc., 311 B.R. 36, 43 (Bankr. D. Del. 2004) (holding a

plan was not proposed in good faith "[g]iven the **unbridled dominance** of the committee in the debtor's affairs and actions during the prepetition period, its **continued influence** flowing from its majority status on the postpetition creditors committee, and the **obvious self-dealing** that resulted from control of the debtor…") (emphasis added).

117.    As in <u>ACandS</u>, the circumstances culminating in the Plan reflect the "unbridled dominance" of the Term Lenders.  One day after the Debtors' Board approved the May 6 Plan (which was to pay general unsecured claims in full), the Term Lenders reversed course and demanded that the Board "revisit certain attributes of the plan . . . in particular the treatment of unsecured creditors."[86] As indicated by the Plan's distribution to unsecured creditors, the Board capitulated to the Term Lenders' demands.[87]  The Term Lenders' overwhelming influence and control over these Cases therefore ought to preclude a finding that this Plan was executed in good faith.  <u>See</u> <u>In re ACandS, Inc.</u>, 311 B.R. at 43.

118.    In sum, the Debtors fail to carry their burden of proof that the Plan satisfies every applicable confirmation requirement under Bankruptcy Codes Sections 1129(a) and (b).  Here, the Debtors do not and cannot meet several of the requirements for confirmation under Section 1129(a) and Section 1129(b), which must be satisfied here because holders of Class 6 General Unsecured Claims have rejected the Plan.  Therefore, confirmation of the Plan must be denied.

---

[86] <u>See</u> Nystrom 7.2 Dep. Tr. at 137:12-21.

[87] <u>See</u> July 17 Hrg. Tr. at 60:22-24 ("Q. Ultimately, though, Black Diamond decided not to pay the unsecured's, right? A. Correct.").

## CONCLUSION

**WHEREFORE**, for the reasons discussed herein, the Committee respectfully requests that this Court: (i) sustain this Objection; (ii) deny confirmation of the Plan; and (iii) grant to the Committee such other and further relief as the Court may deem just, proper and equitable.

Dated:  September 16, 2015
Wilmington, Delaware

**MORRIS NICHOLS ARSHT & TUNNELL LLP**

*/s/ Daniel B. Butz*
Derek C. Abbott (No. 3376)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
1201 North Market Street, Suite 1600
Wilmington, DE 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbott@mnat.com
         cmiller@mnat.com
         dbutz@mnat.com

and

**BROWN RUDNICK LLP**
Steven D. Pohl, Esq.
Sunni P. Beville
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Facsimile:  (617) 856-8201
Email: spohl@brownrudnick.com
         sbeville@brownrudnick.com

Bennett S. Silverberg
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email: bsilverberg@brownrudnick.com

*Co-counsel to the Committee*

62049226 v8-WorksiteUS-000002/3418